[No. S157341. Jan. 25, 2010.]

CATHY LEXIN et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

1054

COUNSEL

Gibson, Dunn & Crutcher and Theodore J. Boutrous, Jr., for Petitioners.

Gibson, Dunn & Crutcher and Nicola T. Hanna for Petitioner Cathy Lexin.

Coughlan, Semmer & Lipman, R. J. Coughlan, Jr., and Earll M. Pott for Petitioner Ronald Lee Saathoff.

Steven J. Carroll, Public Defender, and Greg S. Maizlish, Deputy Public Defender, for Petitioner John Anthony Torres.

Hahn & Adema and David A. Hahn for Petitioner Mary Elizabeth Vattimo.

Law Office of Frank T. Vecchione and Frank T. Vecchione for Petitioner Teresa Aja Webster.

Damiani Law Group and Lisa J. Damiani for Petitioner Sharon Kay Wilkinson.

Jennifer B. Henning, upon request of the Court of Appeal, and Daniel S. Hentschke for California State Association of Counties, League of California Cities and Association of California Water Agencies as Amici Curiae on behalf of Petitioners.

Klausner & Kaufman, Robert D. Klausner and Adam P. Levinson for National Conference on Public Employee Retirement Systems as Amicus Curiae on behalf of Petitioners.

Schwartz, Steinsapir, Dohrmann & Sommers, Robert M. Dohrmann and Henry M. Willis for Local 18, International Brotherhood of Electrical Workers, AFL-CIO as Amicus Curiae on behalf of Petitioners.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Board of Retirement of the Contra Costa County Employees' Retirement Association and Board of Retirement of the Orange County Employees' Retirement System as Amici Curiae on behalf of Petitioners.

Steefel, Levitt & Weiss, Manatt, Phelps & Phillips, Ashley K. Dunning, Amy B. Briggs and Kelly L. Knudson for Los Angeles County Employees' Retirement Association, Los Angeles City Employees Retirement System, Los Angeles Fire and Police Pension System, Los Angeles Water and Power Employees Retirement Plan, Alameda County Employees' Retirement Association, Kern County Employees' Retirement Association, Marin County Employees' Retirement Association, Merced County Employees' Retirement Association, Sacramento County Employees' Retirement Association, San Bernardino County Employees' Retirement Association, San Mateo County Employees' Retirement Association, Sonoma County Employees' Retirement Association, Stanislaus County Employees' Retirement Association, Ventura County Employees' Retirement Association, California Public Employees' Retirement System and California State Teachers' Retirement System as Amicus Curiae on behalf of Petitioners.

Tosdal, Smith, Steiner & Wax, Ann M. Smith and Fern M. Steiner for San Diego Municipal Employees Association, Deputy Sheriffs' Association of San Diego County, SEIU Local 221, Teamsters Local 542 and Teamsters Local 952 as Amici Curiae on behalf of Petitioners.

Robert E. Lindquist, Alice O'Brien, Rosalind D. Wolf, Michael D. Hersh, John F. Kohn and Brenda Sutton-Wills for California Teachers Association as Amicus Curiae on behalf of Petitioners.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Stephen P. Acquisto and Mark R. Beckington, Deputy Attorneys General, for California Public Employees' Retirement System as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Bonnie M. Dumanis, District Attorney, Stephen R. Robinson, Craig E. Fisher and William J. La Fond, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**WERDEGAR, J.**—This case is a residuum of the fiscal crisis that swept the City of San Diego (City) over the last decade. That crisis, arising from the City's failure to fund its employee retirement system adequately, led to federal investigations of the City's bond disclosures, suspension of the City's credit rating, class action lawsuits against the City for underfunding, the mayor's resignation, and amendments of the City's charter to change the composition of the board overseeing the retirement system.

The six defendants below, Cathy Lexin, Mary Elizabeth Vattimo, Teresa Aja Webster, Sharon Kay Wilkinson, John Anthony Torres, and Ronald Lee Saathoff (collectively the Lexin defendants), were trustees of the board administering the City's retirement system. They have been charged with felony violations of state conflict of interest statutes (Gov. Code, § 1090 et seq.)[1] for allegedly voting to authorize an agreement allowing the City to limit funding of its retirement system in exchange for the City's agreeing to provide increased pension benefits to City employees, including the Lexin defendants.

The Lexin defendants brought a Penal Code section 995 motion to set aside the information against them because, they argued, Government Code section 1090[2] and its exceptions were not intended to criminalize the making of contracts by parties whose only financial stake was their interest in government pension benefits. The trial court denied the motion because it concluded pension benefits were not "salary" of the sort the Legislature intended to excuse when it created the government salary exception to section 1090. (See § 1091.5, subd. (a)(9), hereafter section 1091.5(a)(9).) The Court of Appeal rejected this reasoning, but affirmed the denial because it found section 1091.5(a)(9) inapposite for other reasons and because it further concluded the public services exception (§ 1091.5, subd. (a)(3), hereafter section 1091.5(a)(3)) did not apply.

We reverse as to five of the six defendants. We conclude that, with one exception, the defendant trustees' actions fall within statutory exceptions to section 1090, and accordingly their motion to dismiss the information against them should have been granted. This case turns on our conclusion that the trustees of the City's retirement system board were not burdened by a conflict

---

[1] Government Code section 1090 prohibits public officials and employees from having a financial interest in contracts they make in their official capacities.

[2] All further statutory references are to the Government Code unless otherwise specified.

of the sort section 1090 prohibits: a division in the loyalties of public servants between the public interests of their constituents and private opportunities for their own personal financial gain. Rather, by intentional legislative design, many of the board's trustees were members of the retirement system and thus had interests in common with the membership as a whole. That the Lexin defendants were financially interested in the agreement here—like thousands of their fellow retirement system members—was a consequence of this fact. The public services exception to section 1090—section 1091.5(a)(3)—recognizes that financial interests shared with one's constituency do not present the dangers the state's conflict of interest laws were designed to eradicate. Accordingly, it excepts such interests from section 1090's purview.

As applied here, the provision covers the actions of five of the six defendants. The sixth, Ronald Saathoff, could on the preliminary hearing record reasonably be suspected of having obtained a unique, personalized pension benefit as a result of voting to approve the retirement board's contract with the City. Such individually tailored benefits pose genuine conflict problems and do not fall under any statutory exception. Accordingly, we affirm as to Saathoff, reverse as to all other defendants, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *The San Diego City Employees' Retirement System*

San Diego is a charter city. It maintains a pension plan for its employees, the San Diego City Employees' Retirement System (SDCERS). (San Diego City Charter, art. IX, § 141; San Diego Mun. Code, § 24.0101.) SDCERS is a defined benefit plan in which benefits are based upon salary, length of service, and age. (San Diego Mun. Code, §§ 24.0402–24.0405.) The plan is funded by contributions from both the City and its employees. (San Diego City Charter, art. IX, § 143; San Diego Mun. Code, § 24.0402.) Membership is compulsory. (San Diego Mun. Code, § 24.0104, subd. (a).) As of June 2008, the plan had nearly 20,000 members. (SDCERS Comprehensive Annual Financial Rep. (2008) p. 29.)

The pension fund is overseen by a 13-member board of administration (SDCERS Board or Board). (San Diego City Charter, art. IX, § 144.) Although established by the City, the Board is a separate entity. (*Ibid.*;

*Bianchi v. City of San Diego* (1989) 214 Cal.App.3d 563, 571 [262 Cal.Rptr. 566].) The SDCERS Board is a fiduciary charged with administering the City's pension fund in a fashion that preserves its long-term solvency; it must ensure that through actuarially sound contribution rates and prudent investment, principal is conserved, income is generated, and the fund is able to meet its ongoing disbursement obligations. (Cal. Const., art. XVI, § 17; San Diego City Charter, art. IX, § 144.) Consistent with that central mission, the SDCERS Board has a range of ancillary obligations, including but not limited to providing for actuarial services, determining member eligibility for and ensuring receipt of benefits, and minimizing employer contributions. (Cal. Const., art. XVI, § 17, subds. (b), (e); San Diego City Charter, art. IX, §§ 142, 144; San Diego Mun. Code, § 24.0901.) To carry out these duties, the Board is granted the power to make such rules and regulations as it deems necessary. (San Diego City Charter, art. IX, § 144; San Diego Mun. Code, §§ 24.0401, 24.0901; see generally *Bianchi*, at p. 571; *Grimm v. City of San Diego* (1979) 94 Cal.App.3d 33, 39–40 [156 Cal.Rptr. 240].)[3]

The composition of the Board is fixed by San Diego's charter; as of 2002, the charter provided for three ex officio positions (the city manager, treasurer, and auditor), one trustee elected by fire safety members, one elected by police safety members, one elected by retired members, three elected by the active membership, and four appointed by the city council. (San Diego City Charter, art. IX, former § 144.)[4] All six Lexin defendants were trustees of the SDCERS Board. Cathy Lexin, Mary Elizabeth Vattimo, and Teresa Aja Webster were the ex officio designees; Sharon Kay Wilkinson and John Anthony Torres were elected from the active membership; and Ronald Lee Saathoff was the fire safety representative. The six were also City employees: Lexin was the City's human resources director, Vattimo was the City treasurer, Webster was the City's assistant auditor and comptroller, Wilkinson was a City management analyst, Torres was a fingerprint examiner for the City police department crime lab, and Saathoff was a City fire captain.

---

[3] SDCERS and the SDCERS Board are not unique. Other charter cities have established similar pension funds and retirement boards (e.g., L.A. Charter, art. XI, § 1104); counties throughout California have done likewise under the County Employees Retirement Law of 1937 (§ 31450 et seq.); and the state has an analogous pension fund, the California Public Employees' Retirement System (CalPERS), and retirement board, the Board of Administration (§ 20000 et seq.).

[4] In the wake of the events that spawned the instant litigation, the city charter was amended to provide for seven mayoral appointees, one police safety member, one fire safety member, two general members, one retiree member, and one City management member. (San Diego City Charter, art. IX, § 144.)

## II. *Contract Negotiations*

### A. *City Manager's Proposal 1*

Until 1996, the City made contributions to the SDCERS pension fund according to an actuary's annual determination of the rate. In 1996, the City proposed, and the Board approved, an agreement modifying the method of calculating the City's contribution. Under this agreement, commonly known as the City Manager's Proposal 1 (MP1), the City contributed at a set rate, which was less than an actuarially determined rate, under an agreed-upon schedule. The schedule required the City's contribution rate to increase by 0.5 percent per year as a percentage of payroll until the City's annual contribution rate equaled the actuarial rate. At the time the MP1 was adopted, the retirement system was 92.3 percent funded.[5] As part of the MP1, there was a safety valve provision, known as the "trigger," that called for a balloon payment if the funded ratio of the system dropped below 82.3 percent.

In 2001, in part because of the "dot-com" stock market crash, SDCERS earnings began falling significantly. (See Perry, *Fall from Frugality Puts San Diego on Fiscal Brink*, L.A. Times (Sept. 1, 2004) p. 1.) By October 31, 2001, the fund had earned only $14.1 million dollars, a decrease of 87 percent from the previous year. In February 2002,[6] SDCERS actuary Rick Roeder completed a draft actuarial report showing the funded ratio had dropped from 97 percent to 90 percent in one year. The City was concerned the 82.3 percent trigger would be met, which would have required it to make an additional contribution to the pension fund of approximately $25 million within one year.

### B. *Union Negotiations*

At the same time, the City entered meet-and-confer negotiations with its municipal unions over new labor agreements (memoranda of understanding or MOU's), with defendant Lexin, the City's Director of Human Resources, acting as lead negotiator. The County of San Diego had agreed in February to increase the retirement multipliers for its employees.[7] The City's four municipal unions, the San Diego Municipal Employees Association (MEA), San Diego Police Officers Association (POA), San Diego City Firefighters IAFF Local 145 (Firefighters), and American Federation of State, County and

---

[5] A retirement system's funding ratio is calculated by comparing the present value of the system's assets against the present value of its future liabilities.

[6] All further dates refer to the year 2002 unless otherwise specified.

[7] In defined benefit pension plans like SDCERS, retirement benefits typically are calculated by multiplying years of service, peak salary, and a multiplier that varies according to retirement age. (See San Diego Mun. Code, § 24.0402, subd. (d) & table 1.)

Municipal Employees Local 127 (AFSCME), sought comparable improvements in the City's retirement benefits.

According to assistant city manager Lamont Ewell, if the SDCERS funded ratio had continued to fall and the trigger had been reached, the resulting balloon payment would have seriously hampered the City's ability to deliver services and would have led to layoffs. Consequently, the City elected to condition any increase in pension benefits on its obtaining relief from the SDCERS Board from the effect of hitting the trigger. In May, it reached agreements with the MEA, the Firefighters, and AFSCME that included enhanced retirement benefits, but each agreement was expressly conditioned on the SDCERS Board's granting the City contribution relief by lowering the MP1's trigger to 75 percent. The City was ultimately unable to agree on a contract with its fourth municipal union, the POA, and so declared an impasse and imposed its last, best, and final offer; like the agreements with the other unions, that offer included an SDCERS Board contingency.

Negotiations with the Firefighters and its president and lead negotiator, defendant Ronald Saathoff, involved a unique issue. Some union presidents, including Saathoff, were paid by their unions for serving as president. Beginning in approximately 1989, the POA president began contributing to his pension based on the president's salary paid him by his union. In 1997, the MEA president secured the same right.

During the 2002 negotiations, Saathoff sought similar treatment. Concerned about potentially higher pension payments for union presidents, the City considered discontinuing the existing program. However, the city attorney advised that the unions would sue and might prevail based upon their presidents' detrimental reliance on years of informal agreements. Ultimately, the city council, acting on the advice of the city attorney, decided to provide equivalent rights to the union presidents of POA, MEA, and Firefighters, but only as to those presently holding that title and certain former POA presidents; future presidents would not be eligible.

Michael McGhee, a principal negotiator for the City with the Firefighters, testified that he understood at the time that this incumbent union president benefit was contingent on the Board's lowering the trigger. On cross-examination, however, he indicated he had never heard anyone say that the incumbent union president benefit was contingent on anything the SDCERS Board did, nor was there a document that so stated.

## C. *Initial Discussions with SDCERS*

On May 29, 2002, City Manager Michael Uberuaga presented the SDCERS Board with the City's proposal to modify the MP1 to (1) lower the trigger to 75 percent and (2) add a five-year phase-in period for the payment of increased contributions to reach the full actuarial rate if the trigger was hit. Uberuaga told the Board a reduction in the trigger was a contingency of the tentative labor agreements with three of the four municipal unions in the City.

The proposal ran into opposition. After the meeting, Board President Frederick Pierce requested a meeting with Deputy City Manager Bruce Herring. On June 7, Pierce, Herring, defendant Lexin, and SDCERS administrator Lawrence Grissom met, at which time Pierce objected to the linkage between the Board's actions and union benefits. Herring indicated he thought the city council would refuse to drop the linkage. The Board's fiduciary counsel, Robert Blum, also criticized the City's proposal, warning the Board in a draft letter dated June 12 that adoption of the proposal would pose a "material risk that a court would find that approval by the Retirement Board of the proposed amendment[,] including the reduction in the 'floor' in [MP1] to 75 [percent] was not a prudent exercise of the Board's fiduciary responsibilities, particularly if insufficient mitigating actions were taken by the Board."

In response to criticisms of the City's proposal, the City modified the proposal so as to accelerate the presumptive rate at which it would increase its contribution in the event the trigger was not hit, offering a 1 percent of payroll annual increase in lieu of the 0.5 percent the MP1 called for. Deputy City Manager Herring presented this modified proposal to the Board on June 21. Following a lengthy discussion of the City's proposal, the Board elected to defer a vote and to seek more information and analysis. A decision on the proposal was trailed for a future special meeting.

In advance of that special meeting, the City was aware that a Board trustee might offer a counterproposal to the City's proposal. Lexin and Deputy City Attorney Elmer Heap wrote the mayor and city council, explaining that they "anticipate[d] a motion from a Board member which would further modify the proposal before the Board, by eliminating the request to lower the funded ratio floor [the trigger], and including the five year phase-in if the trigger (82.3% funded ratio) is effectuated." Lexin and Heap sought and obtained authorization to agree to this counterproposal.

## D. *The July 11 SDCERS Board Meeting*

At the July 11 special SDCERS Board meeting, the Board discussed in detail the merits of the existing MP1, the City's proposal to reduce the trigger

to 75 percent, and an alternative funding mechanism presented by the Board's actuary, Rick Roeder. Roeder was concerned, as he had been at the June 21 meeting, about the effects of the City's request for contribution relief. Fiduciary Counsel Blum was of the opinion that if the Board accepted the City's proposal, there was a "material risk" that a court would find the Board had not properly exercised its fiduciary responsibility. Others spoke in support of the City's proposal.

Lexin made a motion to accept the City's proposal to lower the trigger to 75 percent, and Webster seconded it. Several Board trustees, including Saathoff, expressed an intent to vote against the City's proposal. As Saathoff put it: "[T]his proposal as it[']s currently written doesn't appear to pass muster in terms of fiduciary counsel's opinion and[,] frankly, the actuary's." He told the Board that the City's proposal was not within what he considered a "fiduciarily prudent guideline and should the motion not be successful, I will have another motion to make that hopefully will address the [C]ity's concerns and give us comfort that the actions we are taking are fiduciarily prudent as members of this Board."

Trustee Diann Shipione made a formal motion to continue the matter. Saathoff opposed the motion, indicating he thought it important to move forward. Shipione's motion was not seconded.

Saathoff then made his substitute proposal, which, with some changes, ultimately came to be known as City Manager's Proposal 2 (MP2). Saathoff moved that (1) the 82.3 percent trigger be kept in place; (2) if the trigger was not hit, the City would increase its contribution rate at 1 percent per year until it reached the full actuarial rate; and (3) if the trigger was hit, the City would have until 2009 to increase its contributions to reach the actuarial rate, in lieu of a balloon payment of $25 million or more. The substitute proposal would be subject to the fiduciary counsel's and the actuary's approval, as well as to negotiation of a formal written contract with the City.

After substantial further discussion, the motion to adopt the City's proposal was withdrawn and the Board adopted Saathoff's proposal by a vote of eight to two. Board President Pierce, John Casey, and the six Lexin defendants—Lexin, Vattimo, Webster, Wilkinson, Torres, and Saathoff—voted in favor of the proposal. Thomas Rhodes and David Crow opposed the motion. Ray Garnica abstained. Trustees Shipione and Richard Vortmann left the meeting before the vote.

### E. *Final Approval of Benefit Enhancements*

From July 11 to November 15, Fiduciary Counsel Blum negotiated with the City to memorialize Saathoff's counterproposal as a written agreement.

During this time period, according to Deputy City Attorney Heap, there were "sticking points," and an agreement, though likely, was not absolutely certain. For example, Blum and Heap debated a nullification clause Blum wanted inserted that would allow the Board to unilaterally rescind the agreement in the future, with Blum ultimately prevailing.

On October 7, the POA, the Firefighters, and the MEA signed finalized MOU's with the City, each effective retroactively to July 1. These final MOU's eliminated any contingency requiring action by the SDCERS Board for benefit increases to take effect. On October 21, the city council voted unanimously to adopt and approve the MOU's.

The city council also enacted the incumbent union president benefit without any reference to contingencies or action by the SDCERS Board. The City agreed to base retirement benefits for incumbent union presidents on their highest one-year combined City and union salary. In contrast, pension contributions for future union presidents would be based solely on their City salary.

Under the MOU's, defendants Wilkinson and Torres, who were classified general City employees,[8] received the same benefits as all other classified general employees, including an increase in their age-55 pension multipliers from 2.25 percent to 2.50 percent, with corresponding 0.25 percent adjustments of the multiplier for each year above age 55. Defendants Lexin, Vattimo, and Webster were unclassified general employees but received the same increased retirement benefits under a City policy that afforded unclassified employees the same benefits as classified employees. Defendant Saathoff, as a classified safety employee, did not receive an increased multiplier but did receive the pension increase accorded incumbent union presidents.

F. *Final Approval of the MP2*

On November 15, the SDCERS Board was presented with a draft of the MP2, which, with some minor changes, essentially reflected the terms of defendant Saathoff's counterproposal.

Fiduciary Counsel Blum gave a presentation to the Board emphasizing the MP2's advantages over the MP1, including an acceleration of increases in the contribution rate and a date certain by which the City had to accomplish full actuarial funding. The finalized MP2 also granted the Board the right to nullify the agreement "to the extent required by its duties established under

---

[8] A classified employee is governed by civil service rules; an unclassified employee serves at will. A general member of the retirement system is any nonsafety member, i.e., everyone other than firefighters, police officers, and lifeguards.

the California Constitution" and required the City to pay any costs incurred to secure enforcement of the agreement's terms. Blum had tried, but failed, to get the City to agree to language precluding it from "bargain[ing] additional benefits conditioned on some approval of . . . funding relief" going forward. Blum opined that the MP2 represented a "proper exercise" of the Board's fiduciary duties. Actuary Roeder offered a series of opinions about the positive and negative aspects of the proposal but no bottom line conclusion.

A vote on the MP2 was taken, and the Board approved it, 10 to two. Defendants Vattimo, Webster, Wilkinson, Torres, and Saathoff, as well as trustees Casey, Crow, Garnica, Pierce, and Vortmann, voted for the contract. Trustees Rhodes and Shipione voted against it. Defendant Lexin was absent. The final MP2 agreement was approved by the City and signed by the Board on December 3, 2002, and by the City on December 11. Under its terms, the 82.3 percent trigger would be kept in place, but in the event the trigger was hit, the City would be given until 2009 to reach the actuarial rate, rather than having to pay a $25 million balloon payment within one year.[9]

### III. *Procedural History*

In May 2005, the Lexin defendants were charged with felony violations of section 1090. After a preliminary hearing, a magistrate found probable cause to suspect the Lexin defendants had violated the conflict of interest laws.

The magistrate concluded the Lexin defendants had participated in the making of the MP2. He also found sufficient evidence had been presented to support a reasonable suspicion that the Lexin defendants were financially interested in the MP2 because pension benefit increases were contingent on its approval. As to defendant Saathoff, the magistrate specifically found that whether Saathoff's individual union president benefit was also contingent on the Board's granting the City contribution relief was a question of fact, and at least one line of evidence supported the conclusion that it was contingent. Finally, the magistrate rejected the Lexin defendants' defense that a statutory exception to section 1090, the government salary exception (§ 1091.5(a)(9)), applied because he concluded pension benefits were not "salary" within the meaning of the statute. Each Lexin defendant was bound over for trial.

---

[9] We note that the MP2 did not survive for long. In 2003, a series of class action lawsuits were filed alleging (1) the City had violated both the city charter and its municipal code by underfunding the City pension fund, and (2) the SDCERS Board had violated section 1090 and breached its fiduciary duties by agreeing to the MP1 and MP2. (*Gleason v. San Diego City Employees' Retirement System* (Super. Ct. San Diego County, 2003, No. GIC803779); *Gleason v. San Diego City Employees' Retirement System* (Super. Ct. San Diego County, 2003, No. GIC810837); *Wiseman v. Board of Administration of the San Diego City Employees' Retirement System* (Super. Ct. San Diego County, 2003, No. GIC811756).) In 2004, the City and SDCERS Board settled these actions. Under the settlement, the City agreed to resume actuarially based contributions in lieu of following the schedule provided for by the MP2.

After an information was filed, the Lexin defendants moved to set it aside (Pen. Code, § 995), alleging inter alia that (1) section 1090 did not apply to their actions, and (2) even if it did, their interest in the contract, i.e., pension benefits, constituted government salary and was permitted under section 1091.5(a)(9).

The trial court denied the motion. In holding there was probable cause to believe the Lexin defendants had violated section 1090, the trial court explained that, in its view, by participating in discussions concerning MP1 modification at a time when the City's tentative MOU's made enhanced pension benefits contingent on rate relief, and by approving a counterproposal modifying the MP1 trigger, the Lexin defendants had made a contract in which they had a financial interest. The trial court also rejected the Lexin defendants' section 1091.5(a)(9) defense, concluding that the defense applied only to a financial interest in government "salary, per diem, or reimbursement for expenses" (§ 1091.5(a)(9)), categories not intended to include pension benefits.

The Lexin defendants filed a petition for a writ of prohibition with the Court of Appeal, seeking the issuance of a writ ordering the trial court to grant their motion to set aside the information. The Court of Appeal summarily denied the petition. We granted review and transferred the matter to the Court of Appeal for issuance of an order to show cause. On remand, the Court of Appeal again denied review, this time in a published opinion. Recognizing that retirement benefits are just a deferred form of employment compensation, the appellate court disagreed with the trial court's conclusion that under section 1091.5(a)(9) pensions were not salary. It nevertheless rejected application of section 1091.5(a)(9) because, it concluded, the benefits of the contracts at issue flowed to the respective individual departments of the Lexin defendants, and section 1091.5(a)(9) was inapposite when one's own department was directly involved in a contract. It further rejected the Lexin defendants' alternate statutory ground for relief, the public services exception (§ 1091.5(a)(3)), primarily because it concluded the provision of pension benefits was not a "public service[] generally provided" (*ibid.*) within the meaning of that provision.

We granted review to resolve the significant questions of first impression this case raises concerning the application of the state's conflict of interest laws.

### DISCUSSION

Penal Code section 995 allows a defendant to challenge an information based on the sufficiency of the record made before the magistrate at the

preliminary hearing. (*People v. Crudgington* (1979) 88 Cal.App.3d 295, 299 [151 Cal.Rptr. 737].) In reviewing the denial of a Penal Code section 995 motion to set aside an information, we "in effect disregard[] the ruling of the superior court and directly review[] the determination of the magistrate holding the defendant to answer." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278]; accord, *People v. San Nicolas* (2004) 34 Cal.4th 614, 654 [21 Cal.Rptr.3d 612, 101 P.3d 509].) Insofar as the Penal Code section 995 motion rests on issues of statutory interpretation, our review is de novo. (*People v. Superior Court (Ferguson)* (2005) 132 Cal.App.4th 1525, 1529 [34 Cal.Rptr.3d 481].) Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]; *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1288–1289 [125 Cal.Rptr.2d 225]) and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is such that "a reasonable person could harbor a strong suspicion of the defendant's guilt" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 251 [127 Cal.Rptr.2d 177, 57 P.3d 654]; accord, *People v. Slaughter* (1984) 35 Cal.3d 629, 636 [200 Cal.Rptr. 448, 677 P.2d 854]; *People v. Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609]).

## I. Section 1090 and Prohibited Conflicts of Interest

Section 1090 provides in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." It codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities. (*Brandenburg v. Eureka Redevelopment Agency* (2007) 152 Cal.App.4th 1350, 1361 [62 Cal.Rptr.3d 339]; *People v. Honig* (1996) 48 Cal.App.4th 289, 317 [55 Cal.Rptr.2d 555] ["Section 1090, it has been said, is an embodiment of the common law with respect to conflicts of interest."].)[10]

---

[10] As early as 1851, the Legislature acted to bar any government official or legislator from being "interested in any Contract made by such Officer or Legislature of which he is a member; or be[ing] a purchaser, or be[ing] interested in any purchase at any sale made by such Officer, or a seller at any purchase made by such Officer in the discharge of his official duties." (Stats. 1851, ch. 136, § 2, p. 522; see *Brandenburg v. Eureka Redevelopment Agency, supra,* 152 Cal.App.4th at p. 1362.) The prohibition was later codified in section 920 of the former Political Code and, in 1943, moved with only minor changes to the Government Code. (Former Pol. Code, § 920, enacted 1872, repealed by Stats. 1943, ch. 134, p. 956; see now Gov. Code, § 1090.)

■ The common law rule and section 1090 recognize "[t]he truism that a person cannot serve two masters simultaneously . . . ." (*Thomson v. Call* (1985) 38 Cal.3d 633, 637 [214 Cal.Rptr. 139, 699 P.2d 316]; see *Stockton P. & S. Co. v. Wheeler* (1924) 68 Cal.App. 592, 601 [229 P. 1020] [the bar against being financially interested in the contracts one makes in an official capacity "is evolved from the self-evident truth, as trite and impregnable as the law of gravitation, that no person can, at one and the same time, faithfully serve two masters representing diverse or inconsistent interests with respect to the service to be performed"].) "The evil to be thwarted by section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality." (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1330 [44 Cal.Rptr.3d 881].) Where public and private interests diverge, the full and fair representation of the public interest is jeopardized.

Accordingly, section 1090 is concerned with ferreting out any financial conflicts of interest, other than remote or minimal ones, that might impair public officials from discharging their fiduciary duties with undivided loyalty and allegiance to the public entities they are obligated to serve. (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289].) Where a prohibited interest is found, the affected contract is void from its inception (*Thomson v. Call, supra,* 38 Cal.3d at p. 646 & fn. 15) and the official who engaged in its making is subject to a host of civil and (if the violation was willful) criminal penalties, including imprisonment and disqualification from holding public office in perpetuity (§ 1097; see *People v. Honig, supra,* 48 Cal.App.4th at pp. 333–338).

■ The Legislature has ameliorated the harsh consequences of section 1090 by creating two categories of interests subject to lesser or no restrictions. First, section 1091 defines a series of " 'remote interest[s].' " Where an interest is remote, a board member may comply with section 1090 by making full disclosure of the interest, noted in the entity's official records, and abstaining from voting on the affected contract or influencing other board members in any way. (§ 1091; *People v. Honig, supra,* 48 Cal.App.4th at p. 317; 89 Ops.Cal.Atty.Gen. 121, 123 (2006), hereafter *Fellows.*)

Second, section 1091.5 defines a series of noninterests (also occasionally referred to as "minimal interests," e.g., *People v. Honig, supra,* 48 Cal.App.4th at p. 318), interests that, while technically within the scope of the financial interests covered by section 1090, as a practical matter do not raise the sorts of conflict of interest problems with which section 1090 is concerned and thus are statutorily excluded from its purview. (83 Ops.Cal.Atty.Gen. 246, 247

(2000), hereafter *Cardoza* [§ 1091.5 identifies instances where "the Legislature has determined that the particular interest is insufficient to merit application of the prohibition"].) While a section 1091 remote interest requires disclosure and abstention, a section 1091.5 noninterest generally is no bar at all to participation in the making of a contract, though in some instances the definition of the noninterest includes specific disclosure requirements. (E.g., § 1091.5, subd. (a)(7) [requiring disclosure of nonsalaried membership in a nonprofit corporation]; § 1091.5(a)(9) [requiring disclosure of government salary interest]; see 89 Ops.Cal.Atty.Gen. 217, 220 (2006), hereafter *Strickland.*)

■ To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests.[11] (§§ 1090, 1091, 1091.5; *People v. Gnass, supra,* 101 Cal.App.4th at p. 1288, fn. 6; *People v. Honig, supra,* 48 Cal.App.4th at p. 322.) Proof of a violation of section 1097, the provision criminalizing violations of section 1090, requires a further showing that the section 1090 violation was knowing and willful. (§ 1097; *Gnass,* at p. 1305; *Honig,* at pp. 333–338.)

## II. *Applicability of Section 1090*

■ What differentiates section 1090 from other conflict of interest statutes such as the Political Reform Act of 1974 (Political Reform Act) (§ 87100 et seq.) is its focus on the making of a *contract* in which one has an impermissible interest. (*People v. Honig, supra,* 48 Cal.App.4th at p. 333.)[12] The information alleges the Lexin defendants illegally made the MP2 contract. The evidence supports, indeed is undisputed, that the Lexin defendants participated in the making of the MP2 contract.[13] Furthermore, the evidence

---

[11] Other affirmative defenses, such as the rule of necessity, may also apply. (See *Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 581 [110 Cal.Rptr.2d 552]; *Eldridge v. Sierra View Local Hospital Dist.* (1990) 224 Cal.App.3d 311, 321–322 [273 Cal.Rptr. 654]; 65 Ops.Cal.Atty.Gen. 305, 309–310 (1982).)

[12] For example, while section 1090 is confined to the making of contracts, the Political Reform Act applies more broadly to cover participation in any "governmental decision" in which one has a financial interest. (See § 87100.)

[13] In this court, the People argue for the first time that the Lexin defendants also illegally participated in making each of three 2002 MOU's between the City and its various unions, and that a section 1090 violation can be predicated on their involvement in these MOU's. While these allegations were not included in the information, the People are free to seek, or a court may order sua sponte, amendment to add additional claims, so long as those claims are supported by evidence taken at the preliminary hearing. (Pen. Code, § 1009; *People v. Graham*

is such that a reasonable person could conclude the Lexin defendants had two separate financial interests in that contract.

"[T]he term 'financially interested' in section 1090 cannot be interpreted in a restricted and technical manner." (*People v. Honig, supra,* 48 Cal.App.4th at p. 315.) The defining characteristic of a prohibited financial interest is whether it has the potential to divide an official's loyalties and compromise the undivided representation of the public interests the official is charged with protecting. (See *Stigall v. City of Taft, supra,* 58 Cal.2d at p. 569.) Thus, that the interest "might be small or indirect is immaterial so long as it is such as deprives the [people] of his overriding fidelity to [them] and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good." (*Terry v. Bender* (1956) 143 Cal.App.2d 198, 208 [300 P.2d 119]; see also *Thomson v. Call, supra,* 38 Cal.3d at p. 645 [direct and indirect interests are equally prohibited].)

■ The Lexin defendants participated in making a contract between the SDCERS, on whose Board they served, and the City, for which they each worked and from which they would receive present and future employment compensation. Under section 1090, this is a potential conflict of interest; indeed, it is a paradigmatic conflict of interest. We and the Courts of Appeal have long recognized that where public officials on behalf of a public entity participate in making a contract with a second entity for which they work, the scenario poses at least the risk that the officials will be compromised by serving "two masters." (*Thomson v. Call, supra,* 38 Cal.3d at p. 645 & fn. 14; *People v. Gnass, supra,* 101 Cal.App.4th at p. 1303; *Miller v. City of Martinez* (1938) 28 Cal.App.2d 364, 370 [82 P.2d 519] [contract with the petroleum company for which a city council member works is void]; see also 86 Ops.Cal.Atty.Gen. 138, 139–140 (2003) [contract with a city council member's law firm is not permitted].)

The People focus on a second set of alleged interests: the Lexin defendants' interest in enhanced pension benefits arising from the various City MOU's and from defendant Saathoff's incumbent union president benefit. The Lexin defendants, the People argue, considered whether to pass the MP2 proposal at a time when approving it would have satisfied a condition inserted in the MOU's and enhanced the likelihood of future benefits for

(1974) 38 Cal.App.3d 251, 255 [112 Cal.Rptr. 915].) However, we need not decide whether the Lexin defendants also made each MOU. As the People correctly note, irrespective of whether the Lexin defendants can be treated as having made any of the MOU's, we can still consider any financial benefits to the Lexin defendants arising from the MOU's to the extent their execution was linked to approval of the MP2. Accordingly, on the facts as presented at the preliminary hearing, the issue whether the Lexin defendants made any of the MOU's is not dispositive.

them. Engaging in such deliberations at a time when they stood to benefit financially from approval of the MP2, and ultimately approving it, constitutes the making of a contract in which they had a prohibited financial interest.

The record offers substantial evidence such that a reasonable person could believe as much. SDCERS Board approval of a contribution rate reduction was inserted as a condition precedent in each of the City's MOU's with the MEA, the Firefighters, the POA, and AFSCME in May 2002. Also in May, the City tentatively approved an incumbent union president benefit for defendant Saathoff. With the contingency in place, the City presented, and the SDCERS Board considered, a rate reduction agreement at meetings in June and July. On July 11, the SDCERS Board preliminarily approved the MP2, which granted the City relief from having to make an immediate $25 million payment if pension funding fell below the 82.3 percent trigger. Each of the Lexin defendants participated in these deliberations and the July 11 vote.

Evidence in the record further supports the conclusion that the City viewed the preliminary approval of the MP2 as sufficient to satisfy the MOU contingencies and, in reliance on it, thereafter agreed to remove the contingencies and award the additional pension benefits. In October 2002, MOU's were signed that dropped the condition precedent and the City separately passed a resolution formally approving Saathoff's benefit. In November, the MP2 was finalized, and in December it was signed.

■ In response, the Lexin defendants argue they had no conflict of interest because any linkage between the MOU's and the MP2 contract had been severed by the time the SDCERS Board finally approved the MP2 contract in November 2002. However, that all MOU contingencies technically were first removed is, for purposes of section 1090, not dispositive. If the record is otherwise sufficient to support an inference that the Lexin defendants participated in making a contract in which they were financially interested, evidence of severance will not at this stage rebut it.

The essence of this point we established nearly half a century ago. In *Stigall v. City of Taft, supra,* 58 Cal.2d 565, we considered whether the following scenario violated section 1090: A city council member owned shares in a plumbing company and also was head of the city's building committee. The city solicited bids for plumbing work, with the council member's company submitting the low bid. In short order, the city council member resigned from the city council and, after accepting his resignation, the city council voted to award the contract to his company. We concluded such a scenario could in fact violate section 1090, notwithstanding that the council member technically had removed himself from the city council before a final, formal contract was approved. As we there explained, an interpretation of section 1090 that focused only on contract formalities might permit

the following subterfuge: "A council member could participate in all negotiations giving a contract its substance and meaning, be instrumental in establishing specifications and schedules most advantageous to his or his firm's particular mode of operation, participate in the selection of his or his firm's offer, resign just prior to formal acceptance of that offer and execute the contract as the other party thereto." (*Stigall,* at p. 570.)

Similarly, in *Thomson v. Call, supra,* 38 Cal.3d 633, a city council approved rezoning that would allow a private developer to construct a highrise complex and in a separate action also agreed to have the developer acquire certain private lands for conveyance to the city for creation of a city park. Thereafter, the developer purchased the private land from, inter alia, one of the city council's members. No purchase contract existed at the time the city council gave its zoning approval, and the contract had neither an express term nor a condition that the developer purchase any land from the affected council member. Nevertheless, all parties contemplated that the subsequent land purchase would occur. That, we concluded, was enough to establish a financial interest in the actions taken earlier and ultimately to violate section 1090. (*Thomson v. Call,* at pp. 644–646; see also *People v. Gnass, supra,* 101 Cal.App.4th at pp. 1299–1301 [financial interest extends to expected or foreseeable future benefits]; *People v. Vallerga* (1977) 67 Cal.App.3d 847, 866–867 [136 Cal.Rptr. 429] [same].)

Here too, it matters not that any contingencies linking the MOU's and the MP2 were removed before formal, final execution of the MP2. From the preliminary hearing record, a reasonable person could conclude the Lexin defendants considered and preliminarily approved the MP2 when they stood to benefit financially from its execution. From that same record a reasonable person could also conclude that the contingencies were removed only because all concerned believed the preliminary approval the Lexin defendants and the SDCERS Board gave for the MP2 would ripen into signed, contractually binding rate relief for the City. Thus, the evidence supports the People's argument that the Lexin defendants were financially interested in the making of the MP2.

The financial interest for defendant Saathoff is slightly different; it allegedly arose from the incumbent union president benefit, rather than from a pension formula multiplier increase. The Lexin defendants argue there is no proof this benefit was conditioned on any specific action by Saathoff or the SDCERS Board and it thus was not a financial interest in the MP2. At this stage of the proceedings, however, the only question we may ask is whether a reasonable person could harbor a "strong suspicion" of a connection between the benefit and the SDCERS Board approving the MP2. (*People v. Uhlemann, supra,* 9 Cal.3d at p. 667.) The magistrate concluded it was at least a question

of fact whether one could infer from the sequence of events in the negotiations an implicit message that the incumbent union president benefit would be looked on more favorably if the SDCERS provided rate relief. We agree.

While the evidence is disputed, for purposes of a Penal Code section 995 motion we focus on the evidence supporting an inference that Saathoff's benefit was contingent on the Board's granting the City rate relief. Circumstantially, in April 2002, City negotiators recommended refusing to extend the incumbent union president benefit to Saathoff. In May, the city council met and, against that recommendation, favored extending the benefit to Saathoff. However, final approval of the benefit was withheld until October, after Saathoff had presented the counterproposal that became the MP2.

More directly, in a May 21 e-mail from defendant Webster to Michael McGhee, a lead City negotiator on the Firefighters contract, Webster asked: "The [Firefighters] write up you sent out did not state that their increased offset was contingent on the Board [re]laxing the trigger . . . . I thought ALL retirement improvements (*including the preside[n]tial leave (?)*) were contingent on the trigger . . . . [*E*]*specially need Ron [Saathoff] behind releasing the trigger since he runs the show at [SD]CERS . . . .*" (Italics added.) In an e-mail reply, McGhee confirmed the retirement benefits were contingent. At the preliminary hearing, McGhee testified that he understood Saathoff's incumbent union president benefit was contingent on the SDCERS Board providing relief.

█ "[P]rohibited financial interests are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances." (*People v. Honig, supra,* 48 Cal.App.4th at p. 315; accord, *People v. Gnass, supra,* 101 Cal.App.4th at pp. 1298–1299.) At the stage of a motion to set aside the information, the People's evidence is, under this standard, strong enough to proceed.

We turn to the question whether any exception applies that categorically excludes the Lexin defendants' interests from the scope of section 1090. As we shall explain, each financial interest the Lexin defendants arguably had is (at least as to five of the six Lexin defendants) covered by an exception. First, any financial interest the Lexin defendants had arising from the formal fact of their employment with the City falls within section 1091.5(a)(9). Second, while any financial interest arising from linkage between the MP2 and the MOU's falls outside section 1091.5(a)(9), it is nevertheless covered by section 1091.5(a)(3). Finally, as to defendant Saathoff, we conclude no exception covers his alleged interest in an incumbent union president benefit and accordingly the prosecution of Saathoff may proceed.

III. *The "Government Salary" Exception (Section 1091.5(a)(9))*

A. *Interpretation of Section 1091.5(a)(9)*

Like the parties, we focus first on section 1091.5(a)(9), the government salary exception. Under that exception, "[a]n officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (9) That of a person receiving salary, per diem, or reimbursement for expenses from a government entity, unless the contract directly involves the department of the government entity that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record." (§ 1091.5(a)(9).)

■ In analyzing the exception's scope, we will, as in every case of statutory interpretation, begin with its language. (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758 [47 Cal.Rptr.3d 216, 139 P.3d 1169].) If the language is clear, our search for meaning is at an end; if it is ambiguous, we may then turn to other tools to divine the Legislature's intent. (*Ibid.*)

■ The language of the government salary exception suggests it was intended to apply to situations where the body or board of which an official is a member is contemplating a contract with—or on behalf of—a government entity for which the official also works. "Body or board" is used in section 1090, and again in section 1091.5(a)(9), to reference the entity of which the official is a member and which he or she is serving "in [his or her] official capacity." (§ 1090.) "Government entity" is used in section 1091.5(a)(9) to reference the party to the prospective contract with whom the official has an employment relationship. Nothing in the language of the statute compels a reading that the "government entity" need be distinct from the "body or board." Thus, the provision may apply both to contracts made with one's employer and contracts made on behalf of one's employer.

■ The text suggests a second point. Section 1091.5(a)(9) creates an exception to the government salary exception for situations where the contract "directly involves the department of the government entity *that employs* the officer or employee . . . ." (Italics added.) Thus, section 1091.5(a)(9) assumes the covered interest is an interest in an existing employment relationship.

The exception to the exception, for contracts that "directly involve[]" the official's or employee's own department, limits this provision slightly. We infer that while the subdivision was intended to excuse an existing government employment relationship as itself insufficient to give rise to a conflict,

where a particular contract involved the official's own department, the risk that it might have personal impacts, generating additional income or other benefits for the employed official, was in the Legislature's eyes too great a risk to permit. Thus, while section 1091.5(a)(9) excludes from section 1090 an existing interest in government salary, it does not permit contracts—those with or directly involving one's own department—that pose a risk of potentially changing the official's salary or other employment financial interests. Prophylactically, contracts directly affecting the official's department are excluded.

 We recognize, however, that section 1091.5(a)(9) is no model of clarity; its text alone is insufficiently clear to establish definitively its meaning. (See *People v. Gnass*, *supra*, 101 Cal.App.4th at p. 1302 ["We are at somewhat of a loss to figure out what section 1091.5, subdivision (a)(9) means from its language alone."]; 78 Ops.Cal.Atty.Gen. 362, 369 (1995), hereafter *Aguiar* ["The scope of subdivision (a)(9) is not readily apparent."].) We thus turn to other sources such as legislative history to supplement our understanding. (See *Microsoft Corp. v. Franchise Tax Bd.*, *supra*, 39 Cal.4th at p. 758.)

Here, the legislative history strongly supports the reading suggested by the text. Under the statutory scheme prior to 1991, it had been a conflict of interest for an individual who was separately employed by a public entity to participate in the making of contracts involving that public entity. Thus, it would have been illegal for an individual who worked as a city police officer, in his simultaneous capacity as a city council member, to also vote on *any* contracts the city made, because he had a financial interest (his salary) in one of the parties to all such contracts (the city for whom he worked). (See Assem. Com. on Elections, Reapportionment, and Const. Amends., 3d reading analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 1; Sen. Com. on Governmental Organization, background information request for Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as introduced Mar. 7, 1991, p. 1.)

The Legislature added section 1091.5(a)(9) to reduce the number of such conflicts by limiting section 1090's prohibition to a public employee's participation in contracts affecting the specific department for which the employee works. (See Assem. Com. on Elections, Reapportionment, and Const. Amends., 3d reading analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 1.) Thus, the aforementioned city council member/police officer could not make contracts relating to the police department, but would now be permitted to participate in making other city contracts, as those would not directly affect or benefit his own employment status. (*Ibid.*; see Assem. Com. on Elections, Reapportionment, and Const.

Amends., Republican Analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as introduced Mar. 7, 1991, p. 1 [bill "simply clarifies the practice of participating in decisions that do not directly benefit the city councilmember"].)

The 1991 legislation, as noted, still treated as a conflict of interest a public employee's participation in any contract dealing with the specific department for which that employee worked. (Assem. Com. on Elections, Reapportionment, and Const. Amends., 3d reading analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 1; *Aguiar, supra,* 78 Ops.Cal.Atty.Gen. at pp. 370–372.) In 1999, the Legislature clarified that in this circumstance, absent any personal financial gain, the interest involved would be only a remote interest under section 1091, so a board with an affected member could still act provided the affected member recused himself or herself. (§ 1091, subd. (b)(13), added by Stats. 1999, ch. 349, § 1.) The intent of the amendment was to "define as a 'remote interest' a situation where the contract is with the specific unit that employs the official *which does not result in any direct financial gain to that official.*" (Assem. Com. on Local Government, Analysis of Sen. Bill No. 689 (1999–2000 Reg. Sess.) as amended June 30, 1999, p. 2, italics added.)

Thus, while the 1999 amendment adding section 1091, subdivision (b)(13) relaxed the prohibition against contracting in a way that affected one's own department, it did so only so long as the contract in question would not result in personal financial gain. By inference, that same restriction is implied in section 1091.5(a)(9). If a contract with an employee's own department qualifies as a remote interest, so long as it involves no direct financial gain to the employee, then a contract with one's government employer not directly affecting one's own department may qualify as a noninterest, provided it too does not involve direct financial gain. Section 1091.5(a)(9) excuses conflicts that arise from the identity of the party with or on whose behalf one is contracting (one's employer, other than one's own specific department), but not conflicts that arise from the actual terms of the contract.

The result is a logical statutory scheme. If a contract an official considers in his or her official capacity is with the official's government employer and involves direct financial gain, the official is prohibited from participating under section 1090. If the contract involves no direct financial gain, but is with or affects the official's own department, the official's interest is a remote interest under section 1091, subdivision (b)(13) and subject to the disclosure and recusal requirements of section 1091. Finally, if the contract involves no direct financial gain, does not directly affect the official's employing department, and is only with the general government entity for which the official works, the interest is a minimal or noninterest under section 1091.5(a)(9) and no conflict of interest prohibition applies.

Court of Appeal and Attorney General opinions interpreting section 1091.5(a)(9) are consistent with this understanding. For example, in *Strickland, supra,* 89 Ops.Cal.Atty.Gen. 217, the Attorney General considered whether a community college district board member could participate in collective bargaining negotiations when his own personal health benefits, as a retired faculty member, were directly tied to those of the faculty with whom the district board would be negotiating. The Attorney General correctly concluded that, notwithstanding section 1091, subdivision (b)(13) and section 1091.5(a)(9), the board member could not. (*Strickland,* at p. 221 & fn. 6.) While the retirement health benefits qualified as government salary for purposes of the two provisions, the contract nevertheless created a personal financial interest—the board member's health benefits would rise or fall according to the results of the negotiations. The board member thus faced a "two masters" problem: as a board member he was obligated to conserve the district's resources, while personally he stood to benefit if the board was lavish in increasing faculty benefits.

■ In *People v. Gnass, supra,* 101 Cal.App.4th 1271, the leading Court of Appeal treatment of section 1091.5(a)(9), the court likewise recognized that the provision was not intended to insulate all participation in contracts that carry the prospect of *changes* in one's own government salary. In *Gnass,* a city attorney was criminally prosecuted for (1) representing his city's public financing authority in forming a series of joint powers agencies and then (2) being hired by the resulting joint powers agencies to serve as bond disclosure counsel for the subsequent floating of public bonds. Defendant Gnass moved to set aside the indictment on, inter alia, the ground that the grand jury should have been instructed on section 1091.5(a)(9) as a potential defense. The Court of Appeal correctly concluded the provision did not apply. It reasoned that the provision should be "understood to apply to contracts under consideration *between two public agencies,* one of which employs the interested person. Where, for example, the person is an *employee* of public agency A and a *board member* of public agency B (or is otherwise in a position to influence agency B's decision), a conflict of interest might arise if agency B were considering making a contract with agency A." (*Gnass,* at p. 1303.) In such a scenario, a court would then be called upon to decide whether the requisites of section 1091.5(a)(9) had been satisfied. In contrast, the case before the *Gnass* court involved no such contract between two existing government entities, with an employment relationship with the second entity already extant; rather, it involved participation in a contract that carried with it the prospect of future new government employment. (*Gnass,* at p. 1303 ["Gnass's conflict of interest, if any, existed *before* the [new joint powers agencies] were created, on the chance that, if they were, he might be hired as disclosure counsel."].) As *Gnass* and *Strickland, supra,* 89 Ops.Cal.Atty.Gen. 217, demonstrate, that a financial interest involves only

government salary is a necessary, but not sufficient, condition for section 1091.5(a)(9) to apply; contracts that may result in future changes to one's government compensation are still excluded from the exception.

In contrast, where the financial interest is only in an existing government salary, and the proposed contract is generally with one's employer but carries no prospect of personal financial benefit, the section 1091, subdivision (b)(13) and section 1091.5(a)(9) exceptions may apply. Thus, a deputy county counsel can serve on a city council and participate in making a contract for law enforcement services between the city and county that does not involve the county counsel's office and thus qualifies for an exception under section 1091.5(a)(9) (85 Ops.Cal.Atty.Gen. 115, 117–119 (2002), hereafter *Battersby*); a city council member can participate in approving a contract for law enforcement services with another city for which the council member once worked, and from which he receives benefits, because those benefits will be unaffected by the contract (85 Ops.Cal.Atty.Gen. 6, 7 (2002)); and a deputy sheriff can serve on a city council and, provided he recuses himself under section 1091, subdivision (b)(13), the rest of the council may negotiate with the county sheriff for the provision of police services (*Cardoza, supra*, 83 Ops.Cal.Atty.Gen. at pp. 248–250).

To summarize: section 1091.5(a)(9), the government salary exception, applies to at least two archetypal scenarios. The first, the scenario the Legislature expressly contemplated, involves a first party contract: an official has an existing employment relationship with government entity A and also, in a separate capacity, has the power to make or influence contracts made by A (other than those sought by his or her own specific department), as with the city police officer/city council member. (Assem. Com. on Elections, Reapportionment, and Const. Amends., 3d reading analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 1; Sen. Com. on Governmental Organization, background information request for Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as introduced Mar. 7, 1991, p. 1.)[14] The second involves a second party contract: an official who makes or influences

[14] Relying on *Strickland, supra*, 89 Ops.Cal.Atty.Gen. 217, and *People v. Gnass, supra*, 101 Cal.App.4th 1271, the People argue section 1091.5(a)(9) applies only to contracts between two separate public agencies, and the contracts here do not qualify. We disagree. The legislative history surrounding section 1091.5(a)(9)'s adoption expressly contemplates application of the subdivision where, for instance, a city employee is also a city council member of the same city. Every city contract would arguably impact the employee, who draws a salary from the city coffers—even contracts with private entities and thus involving only a single public agency. Nevertheless, the Legislature apparently intended section 1091.5(a)(9) to apply to such contracts to the extent they otherwise meet the provision's requirements. (See Assem. Com. on Elections, Reapportionment, and Const. Amends., 3d reading analysis of Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as amended May 15, 1991, p. 1; Sen. Com. on Governmental Organization, background information request for Assem. Bill No. 1402 (1991–1992 Reg. Sess.) as introduced Mar. 7, 1991, p. 1.)

contracts on behalf of government entity A is put in a position of considering a contract with government entity B, for which he or she also works. (See, e.g., *Battersby, supra,* 85 Ops.Cal.Atty.Gen. 115.) In each of these scenarios, section 1091.5(a)(9) is a defense if one's financial interest in a proposed contract is only the present interest in an existing employment relationship with a first or second party to the proposed contract, and thus an interest in whatever indirect or incidental benefits might arise from the simple fact of contracting with or on behalf of one's employer. It does not extend further to contracts that more directly affect one's interests by involving one's own department, or most directly affect one's interests by actually altering the terms of one's employment; such interests directly implicate the "two masters" problems section 1090 was designed to eliminate.[15]

### B. *Application of Section 1091.5(a)(9)*

We consider section 1091.5(a)(9)'s application to the two financial interests we have identified: the Lexin defendants' interests arising from their ongoing employment with the City and their interests arising from 2002 changes to their pension benefits.

The application of the provision to the first set of interests is undisputed; indeed, the People have never identified these interests as illicit. We nevertheless address them briefly by way of illustration of the sorts of interests section 1091.5(a)(9) *was* intended to encompass.

The Lexin defendants are City employees. In their official capacities, they participated in formation of a contract between the SDCERS Board, on which they serve, and the City. Their interests fall squarely within section 1090; they had an employment contract with the entity with which they were negotiating. In the abstract, there is a concern that public officials negotiating with another entity for which they work will have divided loyalties and fail to ensure that the agency they represent (here, SDCERS) obtains the best deal from the entity that employs them (here, the City).

However, these interests also fall squarely within the bounds of section 1091.5(a)(9). The Lexin defendants' interests in their existing employment contracts consisted of government salary, disclosed to all as a matter of public

---

[15] The Lexin defendants' position—that section 1091.5(a)(9) insulates any interest, so long as it is an interest in government salary—is thus considerably too broad. It would permit board members to freely select and hire themselves out for any number of new government positions, or to act in their official capacities to modify their own individual salaries without resort to the rule of necessity. This is not now, nor has it ever been, the law. (See, e.g., *Finnegan v. Schrader, supra,* 91 Cal.App.4th 572 [§ 1090 prohibits a district board from hiring one of the board's own members to be the district manager]; cf. *Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 664–665 [99 Cal.Rptr.2d 897] [interpreting § 1091.5, subd. (a)(6) as permitting contracts that maintain the "status quo" of a spouse's government employment but not extending to contracts that would involve a promotion and pay increase].)

record (given especially that their City employment was a necessary condition of their service on the Board). The MP2 contract was with the City as a whole. Section 1091.5(a)(9) allowed the Lexin defendants, as a general matter, to contract with the City notwithstanding that the City also employed them; the Legislature has deemed such an interest sufficiently inconsequential as to not raise concerns of divided loyalty.

However, section 1091.5(a)(9) is not a complete defense because of the existence of a second set of interests, the pension changes, to which the provision's application is equally clear: to wit, it does not apply. As we have explained, this provision was never intended to permit government officials to negotiate prospective changes in their own government compensation. The preliminary hearing evidence would allow a reasonable person to conclude the Lexin defendants did so here; they participated in discussions of the MP2 when it was linked to pension increases in various City MOU's, pension increases that would apply to each of the Lexin defendants other than Saathoff. Additionally, as the trial court found, the evidence was sufficient to at least raise a factual issue whether Saathoff's incumbent union president benefit was a quid pro quo for actions he took in connection with the MP2.

The Lexin defendants contend the Court of Appeal erred in concluding section 1091.5(a)(9) did not apply because of the "department" proviso, the exception to the exception for contracts "directly involv[ing]" one's own department. (§ 1091.5(a)(9).) We need not reach this issue because the benefits at issue here, direct changes to personal compensation, do not come within the exception for existing interests in government salary in the first instance. This obviates the question whether, if they did, the department proviso might then exclude them from the exception.

In concluding section 1091.5(a)(9) does not apply here, we do not mean to suggest there are not any number of other bases that may in particular well-defined circumstances permit officials to negotiate contracts affecting their personal salaries, as when the rule of necessity applies, when an official or employee is not acting in an official capacity but on behalf of, for example, a collective bargaining unit, or when some other exception to section 1090 applies. We next consider another such exception pressed by the Lexin defendants—section 1091.5(a)(3).

IV. *The "Public Services" Exception (§ 1091.5(a)(3))*

A. *Interpretation of Section 1091.5(a)(3)*

1. *Text and Existing Interpretations*

As with section 1091.5(a)(9), we begin with the text. As of 2002, section 1091.5, subdivision (a) provided that "[a]n officer or employee shall

not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (3) That of a recipient of public services generally provided by the public body or board of which he or she is a member, on the same terms and conditions as if he or she were not a member of the board."[16] Thus, so long as the benefit an official receives from a contract is in the nature of a "public service[] generally provided" by the official's agency, and so long as the benefit is received without special or differential consideration—"on the same terms and conditions" as if the official were not a member of the entity he or she serves—it creates no conflict of interest.

The phrase "public service[] generally provided" is not self-defining, nor is there any useful legislative history that might shed light on the Legislature's intent. Sailing in largely uncharted waters, we find some useful illumination in the few interpretations by the Courts of Appeal and the Attorney General. In *City of Vernon v. Central Basin Mun. Water Dist.* (1999) 69 Cal.App.4th 508 [81 Cal.Rptr.2d 650] (*City of Vernon*), the lone prior published case to address the provision, a member of the board of directors of a municipal water district participated in setting the uniform rates at which the district would sell reclaimed water to wholesalers. He was also the president and owner of one such wholesaler. The Court of Appeal concluded section 1091.5(a)(3) permitted the board member's company to contract to buy water, at rates the board member had participated in setting, without violating section 1090's prohibitions. (*City of Vernon*, at pp. 514–515.)

In arriving at this conclusion, the Court of Appeal specifically rejected the argument that the delivery of reclaimed water to wholesalers for resale could not be a service generally provided by the agency because only a limited universe (there, just 23 wholesalers) partook of the service. It explained that " 'public services generally provided' " was not synonymous with " 'services provided to the general public' " or to the " 'public at large,' " interpretations that in its view would require a "rewrit[ing of] the words of the statute." (*City of Vernon, supra,* 69 Cal.App.4th at pp. 514–515.) "Public agencies provide many kinds of 'public services' that only a limited portion of the public needs or can use. This does not derogate from their characterization as 'public services' according to the ordinary meaning of those words." (*Id.* at p. 515.) Instead, it was enough that the service was provided on uniform terms to an agency's customers. Members of the public could avail themselves of the same terms if they joined that customer base (there, the class of reclaimed water wholesalers).

---

[16] The provision has since been amended to substitute "body or board" for "board" at the end of section 1091.5(a)(3). (Stats. 2005, ch. 348, § 2.) The amendment does not materially alter the provision's meaning.

The Attorney General has reached the same conclusion.[17] In 88 Ops.Cal.Atty.Gen. 122 (2005), hereafter *Spitzer*, the Attorney General considered whether the sale of advertising space in a 75-page city brochure could qualify as a public service generally provided. To be sure, only a few members of the public might seek to place advertising in the city's brochure. But the opinion correctly recognized that while some public services may have a limited audience, this alone does not disqualify them as public services generally provided under section 1091.5(a)(3). (See *Spitzer*, at p. 128 [quoting with approval both *City of Vernon*'s acknowledgement that "[p]ublic agencies provide many kinds of 'public services' that only a limited portion of the public needs or can use" (*City of Vernon*, *supra*, 69 Cal.App.4th at p. 515) and the Mass. Supreme Court's recognition that for many public services, "circumstances may be such that the [public] use or service intended to be secured will practically affect only a small portion of the inhabitants or lands of the Commonwealth. The essential point is, that it affects them as a community, and not merely as individuals . . . ." (*Lowell v. City of Boston* (1873) 111 Mass. 454, 470.)].)

While it does not matter that the public constituency for a particular service may be small, it does matter whether the service has been specifically designed to benefit only a select few: "Here, the particular 'service' provided by the city is not specially tailored or conditioned to meet the individualized needs or circumstances of any city council member. [Citation.] We are not presented with discretionary or highly customized services benefitting one or more council members." (*Spitzer*, *supra*, 88 Ops.Cal.Atty.Gen. at p. 128.) Accordingly, under the aegis of section 1091.5(a)(3), a city council member lawfully could purchase advertising space, at rates set by the city council, to publicize his private business.

Similarly, in *Fellows*, *supra*, 89 Ops.Cal.Atty.Gen. 121, the Attorney General considered the application of section 1090 to airport commissioners who rented airport hangar space from a city. Concluding such rentals were permitted, the Attorney General "reject[ed] the suggestion that due to the limited number of airport hangars and would-be renters (i.e., owners of

---

[17] Attorney General opinions are entitled to considerable weight. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) This is particularly true when construing section 1090 and its related provisions because "the Attorney General regularly advises local agencies about conflicts of interest and publishes a manual designated to assist local governmental agencies in complying with the conflict of interest statutes." (*Thorpe v. Long Beach Community College Dist.*, *supra*, 83 Cal.App.4th at p. 662; see *Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 829 [25 Cal.Rptr.2d 148, 863 P.2d 218] [extra weight should be accorded Attorney General opinions in areas of special expertise].)

airplanes), these particular 'public services' would not be 'generally provided' within the meaning of section 1091.5, subdivision (a)(3)." (*Fellows*, at p. 124.)

■ We conclude these authorities correctly apprehend the scope of the services covered by section 1091.5(a)(3). What matters is not the breadth of the actual recipient class, but that the service has not been intentionally designed to limit that class and is broadly available to all those potentially within it. Reclaimed water sold to any wholesaler who chooses to buy it, advertising space made available to any business that chooses to purchase it, hangar space any citizen-pilot may rent on a first-come, first-served basis—all these are public services generally provided and may be offered to public officials as well without violating the conflict of interest laws.

Application of section 1091.5(a)(3) depends as well on a second key phrase: "on the same terms and conditions as if he or she were not a member of the body or board." The phrase codifies a critical nondiscrimination principle. The Court of Appeal in *City of Vernon*, *supra*, 69 Cal.App.4th 508, and the Attorney General in *Spitzer*, *supra*, 88 Ops.Cal.Atty.Gen. 122 and *Fellows*, *supra*, 89 Ops.Cal.Atty.Gen. 121, concluded section 1091.5(a)(3) applied only because in each instance one could determine the officials were being treated the same as any other member of their agencies' constituencies. (See *City of Vernon*, at p. 515 ["There is no special rate for" the official's company]; *Spitzer*, at p. 128 ["Anyone may pay for advertising space in the brochure at a predetermined rate . . ." and the council member "would not receive a special rate or discount"]; *Fellows*, at p. 124 ["Airport commissioners receive no priority to the hangar space and receive no preferential rental rate."].)

Problems arise, however, when it is not possible to establish that an official's contract was untainted by favoritism arising from the official's insider status. In 80 Ops.Cal.Atty.Gen. 335 (1997), hereafter *Herring*, the Attorney General considered the validity of a proposed transaction between an irrigation district and one of its directors. In exchange for easements to build a canal through private property, the district built bridges over the canal to preserve property access and agreed to maintain them for individual affected private landowners. It also routinely provided construction services to landowners on a first-come, first-served basis at established rates. The director proposed to forgive the district its future bridge maintenance obligation for a bridge servicing only his property, in exchange for road construction services valued at considerably less than the repair work his bridge then needed. (*Id.* at pp. 335–336.)

The Attorney General recognized section 1091.5(a)(3) was inapposite to this sort of "unique exchange." (*Herring*, *supra*, 80 Ops.Cal.Atty.Gen. at

p. 338.) The bridge maintenance termination element of the transaction was singular. For purposes of section 1091.5(a)(3)'s nondiscrimination requirement, it mattered not whether experts might testify that this transaction, considered in a vacuum, was fair. What mattered instead was that there was no way to compare the terms offered the director to those offered others because the proposed exchange was "not available to the other customers of the district *at all*." (*Herring*, at p. 338.)

The Attorney General addressed a similar problem in 81 Ops.Cal.Atty.Gen. 317 (1998), hereafter *Thomson*. A city council member helped establish a municipal small business loan program and, after leaving office, sought to avail himself of the program by obtaining a loan. Problems of incommensurability again barred the transaction. Unlike contracts involving standard goods or services at set rates, "[o]btaining a government loan involves more complex considerations. The loan applicant must qualify, and the public official approving the loan must exercise some degree of discretion and judgment." (*Id.* at p. 320.) In such circumstances, it is impossible to demonstrate conclusively that other nonofficials would have received similar terms. Accordingly, section 1091.5(a)(3) would not shield the proposed loan from conflict of interest prohibitions.

■ These opinions establish, correctly, the principle that for any transaction to pass muster under section 1091.5(a)(3) it must be provable that no preferential treatment was involved. It was "the 'apparent intent of this provision . . . to exempt a board member's receipt of public services that are given under "the same terms and conditions" to the other customers of the public agency.' " (*City of Vernon*, *supra*, 69 Cal.App.4th at p. 515, quoting *Herring*, *supra*, 80 Ops.Cal.Atty.Gen. at p. 338.) Thus, a party asserting section 1091.5(a)(3) as a defense must establish that other constituents of an agency received, or would have received, similar terms.[18] There can be no special tailoring of a contract's terms, no discretion in determining what consideration a particular official must relinquish or may receive.

■ We are mindful as well that when interpreting statutes "we must consider the human problems the Legislature sought to address in adopting [the statute] . . . ." (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018 [22 Cal.Rptr.3d 876, 103 P.3d 276].) One of the corollaries of a republican form of government is that in a "government of the people, by the people, for the people,"[19] public officials will often be part of their own constituencies, at

---

[18] Term variations that hinge on neutral factors wholly independent of an official's status, such as, e.g., price variations based on the size, duration, and location of an advertisement (*Spitzer*, *supra*, 88 Ops.Cal.Atty.Gen. at p. 128 & fn. 2) or residency considerations (*Fellows*, *supra*, 89 Ops.Cal.Atty.Gen. at p. 124, fn. 2), do not affect the section 1091.5(a)(3) analysis.

[19] President Abraham Lincoln, Gettysburg Address (Nov. 19, 1863).

once representatives and members of the class they represent, at once governors and the governed. In a government drawn from the people as a whole, it is inevitable that government benefits may flow to citizen-senators as well as everyday citizens. Public officials often may have a stake in the decisions they make, albeit one undifferentiated from that of their fellow constituents. They must be entrusted to enact laws, adopt rules, and make decisions that affect both their constituency and themselves as members of that constituency.

Such is an unavoidable consequence of representative democracy, but it is a "feature," not a "bug."[20] So long as the stakes are equal—so long as public officials and their constituents have access to benefits "on the same terms and conditions," without respect to the public officials' status (§ 1091.5(a)(3))— there is no conflict of interest because the interests of the officials and their constituency align, rather than diverge. Section 1091.5(a)(3), as we read it, alleviates the paralysis that would ensue if section 1090 prohibited even those contracts where the public officials' financial interests mirrored those of any other constituents.

 This conclusion is consistent as well with the long-standing recognition that section 1090's concern is with *personal* interests, interests that may diverge from those of the constituents the public official represents and place the official in the position of responding to "two masters." "The purpose of [section 1090] is to prohibit self-dealing, not representation of the interests of others." (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1230 [97 Cal.Rptr.2d 467]; cf. *People v. Vallerga, supra,* 67 Cal.App.3d at p. 870 [upholding conviction where the defendant's interest in the contract was "purely personal" and did not involve (as the defendant argued) representation of "dual public interests"].) The conflict of interest laws are designed to address conflicts "arising between a public position and personal interests." (61 Ops.Cal.Atty.Gen. 396, 399 (1978).) In effect, section 1091.5(a)(3) recognizes that an interest is not personal, and poses no "two masters" problem, if it is shared with, and undifferentiated from the interest of, the members of the broad class of constituents a public official represents.

### 2. Comparison with the Political Reform Act of 1974

As a further point supporting this interpretation of section 1091.5(a)(3), we note the interpretation harmonizes section 1090 and its related provisions with the Political Reform Act of 1974 (§ 87100 et seq.).

 It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme

---

[20] See, e.g., Raymond, The Hacker's Dictionary (3d ed. 1996) p. 97; The Jargon File, version 4.4.7 (Dec. 2009) <http://catb.org/jargon/html/F/feature.html> (as of Jan. 25, 2010).

are given effect. (*People v. Lamas* (2007) 42 Cal.4th 516, 525 [67 Cal.Rptr.3d 179, 169 P.3d 102]; *American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1129 [51 Cal.Rptr.2d 251, 912 P.2d 1198]; *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) Two " '[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object.' " (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 [253 Cal.Rptr. 1, 763 P.2d 852], quoting 2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467; see also *Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4 [242 Cal.Rptr. 732, 746 P.2d 871] [in pari materia means " '[o]f the same matter' " or " 'on the same subject,' " quoting Black's Law Dict. (5th ed. 1981) p. 1004].)

Section 1090 is the principal California statute governing conflicts of interest in the making of government contracts. In turn, the Political Reform Act is the principal California law governing conflicts of interest in the making of all government decisions. It is well established that these two acts are in pari materia: "Section 1090 and section 87100 of the [Political Reform Act] are two of the most important statutes in California addressing the problem of conflict of interest by public officials and employees. They both deal with a relatively small class of people, public officers and employees, and share the same purpose or objective, the prevention of conflicts of interests, and hence can fairly be said to be in pari materia." (*People v. Honig, supra,* 48 Cal.App.4th at p. 327; see also 65 Ops.Cal.Atty.Gen. 41, 57 (1982) [interpretation of what constitutes a financial interest under § 1090 and the Political Reform Act should be consistent].) Accordingly, to the extent their language permits, we will read section 1090 et seq. and the Political Reform Act as consistent.

Pertinent here is the Political Reform Act's "public generally" rule. The act prohibits participation in a decision in which one has a "financial interest" (§ 87100); in turn, a financial interest is in part defined as a "material financial effect, distinguishable from [the decision's] effect on the public generally . . ." (§ 87103). Detailed Fair Political Practices Commission regulations further define when a decision's effect may be considered indistinguishable as between the official and the public generally. (See Cal. Code Regs., tit. 2, §§ 18707–18707.9.) Two conditions apply: the decision must affect a "significant segment" of the population in the jurisdiction of the official's agency (*id.*, § 18707.1, subd. (b)(1)), and it must "affect a public official's economic interest in substantially the same manner as it will affect the significant segment" previously identified (*id.*, subd. (b)(2)). Notably, however, the effect "need not be identical." (*Ibid.*)

Our interpretation of section 1091.5(a)(3) affirms for government contracts principles akin to those the Legislature has adopted for government decisions. In a democracy, government decision makers will inevitably make decisions that affect themselves as well. Insofar as the impact they experience is substantially the same as that experienced by a significant segment of their constituency, the concerns that animate conflict of interest law are not implicated; the financial impact is not *personal* to the official. By reading section 1091.5(a)(3) as incorporating congruent principles, we render the laws governing government contracts consistent with those governing government decisions more generally.

 Having thus considered the text of the statute, judicial and Attorney General interpretations, and the surrounding statutory scheme, we conclude section 1091.5(a)(3) should be read as establishing the following rule: If the financial interest arises in the context of the affected official's or employee's role as a constituent of his or her public agency and recipient of its services, there is no conflict so long as the services are broadly available to all others similarly situated, rather than narrowly tailored to specially favor any official or group of officials, and are provided on substantially the same terms as for any other constituent.

### B. *Public Service Generally Provided*

#### 1. *Application to the Provision of Pension Benefits*

We turn to application of these principles to the SDCERS Board. What constitutes a public service generally provided by it?

 The SDCERS Board's role is to manage and administer the City's retirement system. It is responsible for determining who may receive retirement benefits, as well as ensuring that benefits are adequately funded through the sound investment of City- and employee-provided contributions. (San Diego City Charter, art. IX, § 144; San Diego Mun. Code, §§ 24.0401, 24.0901.) The state Constitution obligates retirement board trustees to "administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (Cal. Const., art. XVI, § 17, subd. (a).) The SDCERS Board's trustees are fiduciaries, charged with acting in the best interests of participants and beneficiaries of the plan. (*Id.*, subds. (a)–(b).) In short, the Board's purpose and function are to ensure long term that fully funded retirement benefits are available and delivered to those it deems eligible. The ongoing provision of these benefits to public employees—ensuring that an income stream is available to provide for future pensions, so the promise of future compensation becomes a reality—is the service public retirement boards have been established to provide.

■ The City argues the provision of pension benefits is not a service "provided by" the SDCERS Board, but rather one provided by the City itself. We are not persuaded. The retirement system is funded by the City *and* its employees. (San Diego City Charter, art. IX, § 143.) The system is "an independent entity; all funds for the system are required to be segregated from [C]ity funds, placed in a separate trust fund under the exclusive control of the [SDCERS] Board, and may only be used for retirement system purposes." (*Bianchi v. City of San Diego, supra,* 214 Cal.App.3d at p. 571.) It is the SDCERS Board that is charged with establishing contribution rates that will ensure the promise of a pension becomes a reality. (San Diego City Charter, art. IX, § 143.)[21] The Board is then responsible for investing and managing those contributions, determining the conditions under which individuals may receive benefits, and authorizing payments from the trust fund it administers. (San Diego City Charter, art. IX, § 144; San Diego Mun. Code, § 24.0901.) The Board, not the City, is granted "sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system." (Cal. Const., art. XVI, § 17, subd. (a).) The Board, not the City, is constitutionally charged with ensuring "prompt delivery of benefits and related services to the [system] participants and their beneficiaries." (*Ibid.*)[22] In every meaningful sense of the words, then, pension payments are "provided by" the SDCERS Board.

■ We also conclude the administration of public employee pensions is a service "generally provided" within the meaning of section 1091.5(a)(3). As the Court of Appeal recognized in *City of Vernon, supra,* 69 Cal.App.4th at pages 514–515, services need not be provided to every member of the public at large to qualify. There, only 23 companies availed themselves of the public water sales at issue; in *Fellows, supra,* 89 Ops.Cal.Atty.Gen. 121, only a handful of individuals presumably could take advantage of public airplane hangar space; and the advertising space available in a 75-page brochure in *Spitzer, supra,* 88 Ops.Cal.Atty.Gen. 122, necessarily could be filled by only a few.[23] What matters is not the raw numbers, but whether the service in

---

[21] In passing, we note that the charter authorization for the SDCERS Board to set contribution rates refutes the City's argument that the Board's actions in approving the MP2 were ultra vires. In approving the MP2, the Board was setting future contribution rates, as it was authorized, and indeed obligated, to do.

[22] Indeed, this duty to ensure delivery of benefits and services to participants and their beneficiaries "shall take precedence over any other duty." (Cal. Const., art. XVI, § 17, subd. (b).)

[23] To be sure, many, many more individuals are recipients of the services at issue here. According to the most recent available figures, SDCERS has just under 20,000 members (SDCERS Comprehensive Annual Financial Rep. (2008) p. 29); it had more than 18,000 as

question is made available by a public agency to a broad class of its constituents, the people on whose behalf and for whose benefit it acts, rather than being targeted or tailored to a select few. (See *Spitzer*, at p. 128 [Is the service "specially tailored or conditioned to meet the individualized needs or circumstances" of any government official? Is it a "discretionary or highly customized service[] benefitting one or more" government officials?].) Sometimes that universe is the public at large. Sometimes it is a small group of water buyers or a few local pilots and airplane owners. Sometimes it is thousands, or millions, of public employees. The central point recognized by section 1091.5(a)(3) is the same—that the widespread provision of services and benefits across a public agency's constituency avoids problems of conflict of interest.

Under these guidelines, the pension services the SDCERS Board provides qualify as generally provided. Its pension benefits are broadly available to the agency's constituents, its past, present, and future public employees as well as their family members, a class that may potentially include anyone who chooses to seek, and obtains, public employment.

The Court of Appeal rejected application of section 1091.5(a)(3) in part because it read the provision as effectively including only public utilities, extending only to "services provided by the agency to the public, such as water, gas and electricity. ([*Thomson, supra*,] 81 Ops.Cal.Atty.Gen. . . . at p. 320.) Here, pension benefits are part of a compensation package that is conferred only on City employees, as opposed to the public, through a contract with the City." The People press the same argument on appeal. This reading involves several errors.

First, contrary to *City of Vernon, supra*, 69 Cal.App.4th 508, and the language of the statute, the Court of Appeal limited section 1091.5(a)(3) to services provided to the public at large, rather than to a broad class of the public agency's constituency, a constituency that in many cases may involve a smaller subset of the public. As we have discussed, providing a benefit equally to a broad segment of an agency's constituency, no less than the public as a whole, may ameliorate conflict of interest concerns, and we see no reason to adopt the Court of Appeal's more limited reading.

Second, the Court of Appeal read Attorney General opinions identifying gas, water, and electricity as public services qualifying under section

of June 2002 (SDCERS Comprehensive Annual Financial Rep. (2002) p. 34). As well, thousands more family members are affected by the administration of the City's retirement system. A retirement system like CalPERS provides benefits and services to more than 1.6 million Californians. (See <http://www.calpers.ca.gov/eip-docs/about/facts/general.pdf> [as of Jan. 25, 2010].)

1091.5(a)(3) as providing an *exclusive*, rather than *inclusive*, list of the sorts of services that can qualify as "generally provided." In fact, the Attorney General has concluded only that qualifying services include—but are not limited to—services of that sort. (See *Thomson*, *supra*, 81 Ops.Cal.Atty.Gen. at p. 320 [" 'public services' would *include* public utilities such as water, gas, and electricity, and the renting of hangar space in a municipal airport on a first come, first served basis," italics added].) Before us here, the Attorney General takes precisely this position, reviewing in detail its own opinions and arguing on behalf of amicus curiae CalPERS that "the public services exception has never been viewed as applying solely to utilities provided to the general public. Instead, it has been consistently extended to any services generally provided by a public agency to the constituency served by that agency, as long as those services were provided to the recipients, including public officials and employees, on the same terms and conditions." With this, we agree. The provision of utilities is one kind of generally provided public service, but only one kind. So long as a service is provided on the same terms and conditions to a broad class of an agency's constituency, it may qualify under section 1091.5(a)(3).

Third, while it is true public employment is not available to every citizen who may desire it, and it is also true that neither *City of Vernon*, *supra*, 69 Cal.App.4th 508, nor any of the previous Attorney General opinions deals with a situation such as this where there are entry barriers wholly beyond the control of people who may desire to join a particular constituency, this circumstance does not preclude application of section 1091.5(a)(3). The text of the statute does not define to whom a public service must be provided, and we see no reason to engraft on it a limitation based on the broad, narrow, open, or closed nature of a public agency's constituency. For purposes of the conflict of interest concerns that animate section 1091.5(a)(3), it does not matter that external factors might limit who may join an agency's constituency. It matters only whether the financial interest in question is not personal to an employee or official because it is shared with like members of the public agency's constituency.

## 2. *Retirement Board Structural Considerations*

Our conclusion that section 1091.5(a)(3) permits retirement boards to enter contracts that affect board trustee pension benefits, at least insofar as the effect is the same upon constituents who are not board trustees, is bolstered by a consideration of the nature and composition of these boards. When interpreting a statute, we endeavor to harmonize it with other enactments to the extent possible. (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 991 [70 Cal.Rptr.3d 727, 174 P.3d 741]; see *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006)

40 Cal.4th 1, 15, fn. 11 [50 Cal.Rptr.3d 585, 145 P.3d 462].) As we shall discuss, our interpretation avoids a host of statutory and even constitutional problems that would arise if we were to conclude, as the Court of Appeal did, that no exception to section 1090 permits such contracts.

The Legislature has long embraced the principle of retirement system member representation on public retirement boards. When it authorized the formation of county retirement associations in 1937, the Legislature required that each retirement board consist entirely of association members— one ex officio trustee, one elected trustee, and one appointed trustee, all of whom were, under the original version of the law, compulsory members. (Stats. 1937, ch. 677, §§ 42, 55, pp. 1901–1903; see §§ 31520, 31520.1 [mandating member representation on county boards].) The board for CalPERS, the state retirement system, has since 1945 followed the same plan; at present, six of the 13 trustees are elected from its membership. (*California State Employees' Assn. v. Board of Administration* (2003) 113 Cal.App.4th 137, 139 [5 Cal.Rptr.3d 922]; § 20090.) The City has likewise adopted this model; since at least 1931 its charter has provided for plan members to serve on the SDCERS Board. (San Diego City Charter, art. IX, former § 144, as approved by Leg., Apr. 15, 1931.) The state Constitution now includes special protections for all retirement boards that contain employee representation, limiting the extent to which the Legislature may alter their composition. (Cal. Const., art. XVI, § 17, subd. (f).)

It is thus quite clear the Legislature *intended* for retirement board trustees to share interests with their memberships. This is an understandable choice: as the Court of Appeal has said in discussing the City's charter provision dictating ex officio, employee, and retiree representation, "[t]he evident purpose of this latter provision is to secure a board as objective, fair and competent as possible through the representation of all those interests necessarily involved within a public service retirement system." (*Grimm v. City of San Diego, supra,* 94 Cal.App.3d at p. 39.) Under the disinterested model of decisionmaking, one might seek fairness and competence through a decisional body composed entirely of individuals cleansed of any direct stake in the outcome—blue ribbon panels like the Warren Commission, most outside boards of directors, the United States Supreme Court. Alternatively, under the interested model of decisionmaking, one might seek the same ends through a blend of individuals, each with a clear stake in many decisions, with the belief that through the representation of all stakeholders, fair and wise decisions will again emerge. The Legislature and the City have each plainly chosen the latter model in composing public retirement boards.[24]

---

[24] They are not alone. Member trustees have long been a standard feature of the composition of most public retirement system boards. (See 49 Ops.Cal.Atty.Gen. 91, 94 (1967) ["It is customary in public retirement programs to provide for employee representation on the board

Having necessarily interested trustees on a governing board poses a dilemma as to how to reconcile that potentially beneficial arrangement with conflict of interest prohibitions. Every decision a retirement board makes and every contract it enters into is likely to affect the financial interests of its employee/retiree members. As in this case, such contracts fall under section 1090's prohibitions. Unless an exception applies, a conflicted board can only contract pursuant to the rule of necessity. (See *Finnegan v. Schrader, supra*, 91 Cal.App.4th at p. 581; *Strickland, supra*, 89 Ops.Cal.Atty.Gen. at p. 221.) The rule of necessity permits a government body to act to carry out its essential functions if no other entity is competent to do so (*Eldridge v. Sierra View Local Hospital Dist., supra*, 224 Cal.App.3d at pp. 321–322; see *Olson v. Cory* (1980) 27 Cal.3d 532, 537 [178 Cal.Rptr. 568]), but it requires all conflicted members to refrain from any participation. If a quorum is no longer available, the minimum necessary number of conflicted members may participate, with drawing lots or some other impartial method employed to select them. (*Eldridge*, at pp. 322–323.)

We think it clear the Legislature cannot have intended, in mandating inclusion of employees on retirement boards, simultaneously to require under section 1090 that these same employee trustees absent themselves from participation in every contract into which the board enters. As the Attorney General and numerous amici curiae argue, for retirement boards to make findings of necessity and then either exclude all employee and retiree trustees or draw lots before considering most contracts would fundamentally alter the way they operate and substantially impair the effective representation of employee and retiree interests.[25] Such a result would be all the more unusual in light of the constitutional guarantees in place to ensure that the composition of retirement boards with employee representation is insulated from unilateral legislative tampering (see Cal. Const., art. XVI, § 17, subd. (f)); by

managing the plan."].) A recent study of a national public retirement system database suggests that, on average, slightly over one-third of all public retirement board trustees are elected from the membership. (Hess, *Protecting and Politicizing Public Pension Fund Assets: Empirical Evidence on the Effects of Governance Structures and Practices* (2005) 39 U.C. Davis L.Rev. 187, 195.) Professor Hess argues that this arrangement may have significant financial benefits: member trustees' interests are aligned with the performance of the funds they oversee, and thus "board members who are also plan members may improve the performance of the fund due to their direct financial interest in the plan's performance." (*Id.* at p. 198.) At least one regression analysis confirms a positive impact on pension fund performance arising from having at least some elected member trustees on a public retirement system's board. (*Id.* at p. 214.)

[25] Several amici curiae note a further consequence that would arise in the absence of any section 1091.5 exception: retirement boards would be unable to obtain any advice from their (now conflicted) staffs, who would share the same interest in any contracts affecting the pension fund. In a drafting oddity, the remote interest exceptions of section 1091 apply only to "officer[s]" (§ 1091, subd. (a)), not to "officer[s] or employee[s]" (§ 1091.5, subd. (a)), so pension fund board members can obtain staff advice concerning contracts affecting the pension fund only if some section 1091.5 minimal interest exception applies.

effectively shifting the de facto composition of such boards, it would accomplish indirectly what the Legislature is constitutionally prohibited from accomplishing directly.[26]

Under our reading and application of section 1091.5(a)(3), such difficulties are avoided. Section 1090 and the various legislative enactments mandating employee participation on retirement boards must be harmonized if at all possible. The Legislature and the City both clearly see having retirement board representatives who share the interests of their constituents as beneficial. A legislative body with this view cannot have intended simultaneously to establish a set of conflict of interest rules that would expose to criminal liability every employee trustee who fulfilled his or her board's duties to enter contracts of general benefit to the retirement system membership as a whole. By reading section 1091.5(a)(3) to permit employee trustee participation in instances where the trustee's financial interest mirrors that of the board's constituency as a whole, we harmonize the rules governing conflicts of interest and those governing pension fund management. Employee representation in decisionmaking and contracting is preserved to the extent possible; contracts that actually involve unique personal financial interests not shared by the board's constituency remain prohibited. Section 1090 was adopted to curtail the "two masters" problem that arises when an official's personal interests are at odds with those of the public constituency he or she is duty bound to represent; when those interests are in alignment, no policy or statute compels us to disturb the composition of the boards the legislative branch and the cities of this state saw fit to establish.[27]

---

[26] Proposition 162, the constitutional provision precluding legislative tampering with public retirement board composition for those boards with employee trustees, was passed to allow "retirement board trustees [to] be free from political meddling and intimidation." (Prop. 162, § 2, subd. (f), text reprinted at Stats. 1992, p. A-230.) The apparent concern was that legislative alteration of a public retirement board's composition could result in a board dominated by trustees appointed by, and loyal to, the plan sponsor at the expense of the membership. (See Prop. 162, § 2, subd. (g) [safeguards needed "to prevent political 'packing' of retirement boards"]; see generally Hess, *Protecting and Politicizing Public Pension Fund Assets: Empirical Evidence on the Effects of Governance Structures and Practices, supra,* 39 U.C. Davis L.Rev. at pp. 195–199 [discussing dynamics of various retirement board compositions].)

[27] As well, this interpretation alleviates the potential retirement board paralysis that could result if section 1091.5(a)(3) were inapposite. The People argue before us that the setting of contribution rates alone, when a contract offering benefits is contingent on what rates are set, can constitute a prohibited making of a contract under section 1090 and that no exception would apply. But this raises the prospect that whenever a plan sponsor enters such contingent agreements with its unions—a practice the SDCERS Board's fiduciary counsel was unable to get the City to renounce—a retirement board would be precluded from taking any action that might satisfy the contingencies, even if contribution rates satisfying the contingencies were those deemed actuarially most sound and most consistent with the board's fiduciary duties.

## C. *Same Terms and Conditions*

■ We further consider application of section 1091.5(a)(3) to the two distinct pension-related financial interests disclosed in the record: (1) a 0.25 percent increase in the basic pension formula multiplier at age 55, provided to five of the six Lexin defendants but not defendant Ronald Saathoff, and (2) an incumbent union president benefit, provided to Saathoff and apparently no one else. Other than for Saathoff, the record here discloses no customized, specially tailored benefits. We thus conclude section 1091.5(a)(3) covers the actions of each of the Lexin defendants except Saathoff.

### 1. *Lexin, Vattimo, Webster, Wilkinson, and Torres*

Defendants Cathy Lexin, Mary Vattimo, Teresa Webster, Sharon Wilkinson, and John Torres each had the age-55 percentage multiplier that would be used in their pension calculations increased from 2.25 percent to 2.50 percent. This is the same increase that applied to every nonsafety City employee. These defendants' interests thus mirrored those of their constituents; they received a pension benefit on the same terms and conditions as did a broad segment of their constituents, without regard to their board membership, and with no special tailoring or individualized consideration. Similarly, the MP2 affected each of the Lexin defendants and their members equally—they had the same financial interest as their members in ensuring a stable pension fund. For public officials to have a conflict of interest, there must be some differentiation between their financial interests and the financial interests of those they represent. Here, there was none.

The Court of Appeal nevertheless concluded section 1091.5(a)(3) could not apply because the SDCERS Board was faced with an exercise of discretion in deciding whether to approve modified contribution levels in exchange for increased pension benefits. Relying on *Thomson, supra,* 81 Ops.Cal.Atty.Gen. at page 320, the Court of Appeal reasoned that where an element of discretion is involved, section 1091.5(a)(3) necessarily does not apply. The People echo this argument.

The Court of Appeal, and the People, misapprehend when and where discretion is problematic for purposes of section 1091.5(a)(3). As we have explained, because section 1091.5(a)(3) requires Board members to receive any benefit from a public service on the "same terms and conditions" as if they were not Board members, discretion in the allocation of a benefit is problematic. Discretion in either (1) *who* receives a benefit or (2) *how much* of a benefit one should receive renders any benefit incomparable; one cannot determine whether the board members have in fact received the benefit on the same terms and conditions as would have been the case for other, nonboard

members. Special tailoring is forbidden; discretion in the allocation of a benefit raises the specter that such special tailoring might have occurred. It is for this reason the Attorney General correctly concluded the former council member in *Thomson, supra,* 81 Ops.Cal.Atty.Gen. 317, could not avail himself of a city loan program: receipt of, and the amount of, a loan depended on a discretionary decision concerning the individual business's creditworthiness. In contrast, benefits available on a nondiscretionary basis— e.g., use of the hangar spaces on a first-come, first-served basis in *Fellows, supra,* 89 Ops.Cal.Atty.Gen. 121—pose no special tailoring problems.

 While discretion in the availability of the financial interest may bar application of section 1091.5(a)(3), nothing in the language of that section or in any case or opinion interpreting it suggests discretion in the establishment of benefits that will then be available to a broad group of constituents is problematic. Surely there was an element of discretion in the setting of reclaimed water rates, advertising rates, and hangar rates (see *City of Vernon, supra,* 69 Cal.App.4th 508; *Spitzer, supra,* 88 Ops.Cal.Atty.Gen. 122; *Fellows, supra,* 89 Ops.Cal.Atty.Gen. 121); once set, though, these rates applied equally to all. The SDCERS Board had discretion over whether to enter into a contract that established a particular contribution rate, but nothing about the allocation of benefits that might flow from such a contract was discretionary; instead, future pension benefits are to be distributed to all constituents, in accordance with strict formulas factoring in salary, length of service, and age. (San Diego Mun. Code, § 24.0402.) Similarly, retirement boards have discretion in negotiating with third party health care providers for the provision of health benefits for their constituents, but that discretion does not disable them from doing so notwithstanding that some board trustees may be among the class who will receive health care—on a nondiscriminatory basis according to uniformly applicable rates. The presence of discretion in the formation of a contract that section 1091.5(a)(3) purportedly permits is not fatal, unless the discretion can be exercised to permit the special tailoring of benefits to advantage one or more board members over their constituency as a whole. Absent such a risk of favoritism, discretion is unproblematic.[28]

On appeal, the City raises an additional argument for finding the section 1091.5(a)(3) exception inapposite: the pension multiplier increase applied to current employees but not to retirees. We conclude this fact does not foreclose application of the exception.

---

[28] We note that the Attorney General, appearing on behalf of amicus curiae CalPERS, agrees the Court of Appeal misread *Thomson, supra,* 81 Ops.Cal.Atty.Gen. 317. The Attorney General argues discretion per se is not fatal; as we have previously recognized, "discretion" is a nebulous term because "almost all acts involve some choice among alternatives . . . ." (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 981 [42 Cal.Rptr.2d 842, 897 P.2d 1320].) Rather, the Attorney General explains, the discretion it had in mind in *Thomson* that would render section 1091.5(a)(3) inapplicable was the sort of discretion involved in crafting an "individually tailored contract." We agree with this view of section 1091.5(a)(3).

As noted, the language of the subdivision specifies that the service a board member receives must come "on the same terms and conditions as if he or she were not a member of the body or board." (§ 1091.5(a)(3).) There must be no special treatment for the board member, either express or implied, as a consequence of board membership. Where, however, the board member receives benefits on the same terms and conditions as similarly situated constituents who are not board members, section 1091.5(a)(3) may apply.

Here, active Board trustees received the same benefits as active nontrustees; retired Board trustees received the same benefits as retired nontrustees. Saathoff aside, the remaining Lexin defendants received the same pension benefit as the more than 6,000 other active nonsafety City employees. Their interest was not personal, but was shared with their constituents; they had the same interest every other current nonsafety City employee had.[29]

### 2. Saathoff

We turn to the separate question of Ronald Saathoff's financial interests. The record discloses that in 2002, the San Diego City Council approved a pension benefit that uniquely benefitted Saathoff as the incumbent president of the Firefighters: he would be permitted to make pension contributions based on his union salary *and* his City salary, and would have his eventual pension calculated based on his combined salary. At the same time, the city council voted that no future union president would receive this benefit; henceforth, union presidents' pension benefits would be calculated based only on their City salary. As the Lexin defendants note, the presidents of the POA and the MEA, who it appears earned no City salary, previously had been granted the right to make pension contributions based on their union president salaries, but this only underlines the point that the benefit approved for union presidents in 2002, and denied prospectively to all future union presidents, was uniquely advantageous to Saathoff. As such, it could be found to be an individually tailored benefit that raised the prospect of favoritism or more nefariously—under the People's theory here—buying off a key vote, the person who "runs the show" at SDCERS.

---

[29] A similar scenario arises when, for instance, a legislative body votes on tax proposals. Such proposals will affect different members of the polity differently. As every member of the legislative body is a citizen and constituent as well, the proposals will inevitably affect members of the legislative body differently too. Ordinarily, however, every legislator will be affected the same as any and all similarly situated nonlegislators. Such differences, generally speaking, are not tailored to afford special benefits to the legislators themselves. This is an unavoidable feature of a republic—representatives drawn from the polity as a whole to represent the interests of a constituency will in some instances necessarily be affected by the measures they must approve. (Cf. §§ 87102.5–87103 [excluding from the purview of the conflict of interest laws legislators' decisions that affect a financial interest they share with the public generally].)

 Section 1091.5(a)(3) does not insulate such unique benefits from prosecution. A unique benefit cannot be said to have been provided "on the same terms and conditions," wholly independent of the recipient's board status; at a minimum, as with the business loan at issue in *Thomson, supra,* 81 Ops.Cal.Atty.Gen. 317, on the record before us there is simply no way to know whether favoritism played a role. Accordingly, Saathoff has failed to demonstrate as a matter of law that section 1091.5(a)(3) applies. Because section 1091.5(a)(9) likewise does not apply, the trial court was correct to deny the Penal Code section 995 motion as to him.[30]

\* \* \*

 In closing, we note that, the applicability of section 1090 aside, a wealth of other legal remedies exists to ensure municipalities and retirement boards do not abuse the public trust. Both groups are subject to actions for declaratory relief or mandamus challenging their decisions (see, e.g., *Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140 [38 Cal.Rptr.3d 544]; *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109 [61 Cal.Rptr.2d 207]), as the City and SDCERS Board were sued here. Retirement board trustees are fiduciaries (Cal. Const., art. XVI, § 17) and as such are subject to suit for breach of fiduciary duty when their decisions fall short of the standard the law demands. We express no opinion as to whether the Lexin defendants breached their fiduciary duties here, nor whether they might otherwise have been subject to civil liability for their actions. We hold only that, where retirement board trustees approve contracts in which their only financial interest is an interest in benefits shared generally with their constituency at large, section 1091.5(a)(3) excludes such actions from the purview of section 1090.

---

[30] The Lexin defendants raise due process concerns and argue the rule of lenity should be applied to grant them relief. We need consider these arguments only as they relate to Saathoff. We have explained that the rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in relative equipoise . . . .' " (*Burris v. Superior Court, supra,* 34 Cal.4th at pp. 1022–1023, quoting *People v. Jones* (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165].) It has no application where, "as here, a court 'can fairly discern a contrary legislative intent.' " (*Burris,* at p. 1023, quoting *People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) Neither section 1091.5(a)(3) nor section 1091.5(a)(9) presents an interpretive problem so close that we must resort to the rule.

Nor do due process considerations prevent the case against Saathoff from proceeding. The Lexin defendants' argument rests on concern that the Court of Appeal's interpretation of the "department" exception to the salary exception in section 1091.5(a)(9) unforeseeably constricted that provision. As we do not rely on the Court of Appeal's interpretation, the argument has no force. Nor does anything in our own interpretation of section 1091.5(a)(9) unforeseeably narrow its scope—no existing precedent suggests the conduct the People allege Saathoff engaged in was permissible. (See *People v. Chacon* (2007) 40 Cal.4th 558, 570 [53 Cal.Rptr.3d 876, 150 P.3d 755].)

## DISPOSITION

For the foregoing reasons, we affirm the Court of Appeal's judgment as it relates to defendant Ronald Lee Saathoff, reverse it in all other respects, and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

The petitions of petitioner Ronald Lee Saathoff and real party in interest for a rehearing were denied April 22, 2010, and the opinion was modified to read as printed above.