Filed 3/17/21  P. v. Navea CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL SOTTO NAVEA,<br><br>    Defendant and Appellant. | H047253<br>(Santa Clara County<br>Super. Ct. No. B1581148) |

## I.    INTRODUCTION

Defendant Rafael Sotto Navea appeals after a jury found him guilty of seven counts of grand theft by an employee (Pen. Code, § 487, subd. (b)(3))[1] and found true a white collar crime sentencing enhancement allegation attached to all counts (§ 186.11, subd. (a)(1)-(2)).  The jury also found true the sentencing enhancement allegations that three of the thefts involved a loss in excess of $65,000 (Former § 12022.6, subd. (a)(1)) and two of the thefts involved a loss in excess of $200,000 (Former § 12022.6, subd. (a)(2)).  The trial court sentenced Navea to an aggregate term of nine years four months in prison.

Navea contends that the trial court erred when it enhanced his sentence pursuant to section 12022.6 because the statute was repealed by operation of its sunset clause before he was convicted and sentenced.  The Attorney General counters that the enhancement was appropriate because Navea committed the crimes when the statute was operative and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the Legislature sufficiently indicated its intent that the statute's repeal apply solely prospectively.

We determine that section 12022.6's repeal by operation of its sunset clause does not apply retroactively to Navea because there is no evidence that the Legislature did not intend section 12022.6's enhanced punishment scheme to apply to offenses committed throughout the statute's effective period. (See *In re Pedro T.* (1994) 8 Cal.4th 1041, 1049 (*Pedro T.*).) Accordingly, we affirm.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A. *Trial Evidence*

#### 1. Prosecution Case

Navea was the controller at the Cupertino Inn and the Grand Hotel from approximately 2008 to early 2014. Both properties were managed by De Anza Building and Maintenance, Incorporated (De Anza), which had its own controller. As the hotels' controller, Navea was responsible for the hotels' "financials." Navea wrote the checks to pay the hotels' expenses and supply the hotels' petty cash drawers, although the hotels' general manager, Barbara Perzigian, signed all the checks. Navea also generated the hotels' financial and operating statements, made all the entries on the hotels' general ledgers, and ensured that the hotels' "cash tied to the bank statements."

Each hotel kept around $2,500 in petty cash on hand. Because the petty cash usually had to be replenished once per week, Perzigian signed a check for each hotels' petty cash that Navea prepared each week. The petty cash was primarily used for food needed at the last minute and for gas for the hotels' limousines. When cash was used to pay for items, a corresponding receipt was placed into the petty cash drawer. Navea collected the receipts. Between 2005 and 2011, approximately three to five checks were made payable to petty cash monthly for each hotel. For the year 2005, checks payable to petty cash drawn on the Grand Hotel's bank account totaled $28,856.50.

Around February 2014, De Anza's controller, Robert Mori, noticed accounting "oddities" during an audit of the hotels. Mori noticed from his review of the hotels' general ledgers that many of the checks written to petty cash were missing. Mori determined that the missing checks "were purposely deleted out of the [hotels'] accounting software." The hotels' bank statements indicated that all of the missing checks were made payable to petty cash or to Navea. In order to balance the bank accounts despite the deleted checks, an entry was made in each hotels' accounts receivable account, causing the hotels' accounts receivables balances to "increase[e] to a level that stood out as being more than it should be."

Mori also observed that from mid-2012 to February 2014, there were an "alarming number" of checks written to petty cash or Navea per month. For example, in February 2014, approximately 20 checks were made payable to petty cash or to Navea. The checks were written for between $1,500 to $2,000 each. All told, from January 2012 through February 2014, Navea wrote checks on the Cupertino Inn's bank account payable to petty cash for a total sum of $457,220.21. From January 2011 through February 2014,[2] Navea wrote a cumulative total of $531,771.62 in checks payable to petty cash drawn on the Grand Hotel's bank account. Mori was unable to determine "with a hundred percent certainty" which petty cash checks from each hotel were fraudulent because three to five petty cash checks were legitimately written for both hotels every month. However, he "suspect[ed] that the ones that were deleted were certainly fraudulent."

According to the Perzigian, Navea never personally paid hotel expenses and there was no reason for checks from the hotels' general operating accounts to be made payable to him, "especially in these amounts." Perzigian was unaware of how her signature got onto the petty cash checks drawn on the hotels' accounts because she "would not have signed petty cash checks for every day for several days in a row." She only signed one

---

[2] The record does not disclose why the time periods for the assessed sums of petty cash checks for each hotel varied.

3

petty cash check per week for each hotel and never authorized Navea to cash petty cash checks more than once a week.

At some point after Mori noticed the accounting discrepancies, a De Anza accountant met with Navea under the guise that he wanted to get an understanding of how the Cupertino Inn's accounting system worked. Some of Navea's responses to the accountant's questions were not "satisfactory." A follow-up meeting was scheduled for a couple days later regarding missing petty cash receipts.

Navea did not show up for the follow-up meeting or return to his office. Perzigian found Navea's resignation letter in her inbox on the day of the follow-up meeting.

A Sunnyvale police detective determined that Navea sent over $100,000 to several women in the Philippines "during the time of the alleged embezzlement." Navea left the United States on March 30, 2014, and returned from Manila on February 23, 2018, when he was arrested at the airport. A search of Navea revealed a cell phone and two flash drives. One of the flash drives had images of "individual [*sic*] signatures" and individuals' photographs saved in format that allowed them to be placed onto documents.

Bank records for each of the hotels' bank accounts were admitted into evidence.

### 2. Defense Case

Forensic document examiner Sean Espley testified that he examined 116 "questioned checks," dated between October 2013 and December 2013, to determine "authorship of th[e] . . . signatures." All of the checks bore Perzigian's alleged signature and were written on either the Grand Hotel's or the Cupertino Inn's bank account. Espley compared the hotels' checks to checks bearing Perzigian's "known signature[]," as well as a legal contract. Espley determined that "there is evidence . . . which indicates that . . . Perzigian is the author of the . . . questioned signatures" on the hotels' checks and there is "no evidence to suggest that another party is responsible for those . . . signatures."

John Vidovich, one of the owners of the Grand Hotel and the Cupertino Inn, testified that he hired Perzigian to be the general manager of both hotels many years ago.

4

Perzigian's job as general manager was to run the hotels; she was "responsible for everything."

At some point, Vidovich learned that "the records" for the petty cash accounts were not retained, which was "a very, very bad sign." Vidovich contacted Perzigian about the problem and felt that Perzigian did not act with "urgency" in response to the news. Vidovich also thought that Perzigian was not helpful in locating Navea. Vidovich fired Perzigian because he and his partners felt she was unfit to be the manager "under those circumstances."

On April 4, 2014, Sunnyvale Police Officer Gregory Winkelman responded to the Grand Hotel regarding the embezzlement. Officer Winkelman stated that on his arrival, hotel executives informed him that they discovered "some checks had been fraudulently produced, cashed, and then erased from their system." They estimated that half a million dollars was missing from the Grand Hotel's bank account and "just under that" was missing from the Cupertino Inn's account. They believed Navea was responsible for the theft. The executives gave Officer Winkelman approximately 56 checks they believed "may have been manipulated." Officer Winkelman spoke to Perzigian because she was "responsible for signing the checks." Perzigian speculated that 18 of the checks "may have been forged."

Navea testified that he came to the United States from the Philippines in 1986 for employment. Navea's wife stayed in the Philippines and he regularly sent money to her "for saving."

In 2000, Navea became the night auditor at the Grand Hotel and the Cupertino Inn. In March 2006, Perzigian asked Navea to be the controller after she fired the former controller. Perzigian trained Navea to be the controller, telling him that she "suppl[ied] . . . the information, and . . . all [he] ha[d] to do is record [it]." Perzigian "dictate[d] everything." When Navea inputted information into the hotels' accounting system, it was based on Perzigian's notes. Navea prepared monthly reports for De Anza, which he gave

5

to Perzigian for review and approval.  Perzigian asked Navea to change entries "[a]ll the time," usually "from [the] manager's expense[s]," by transferring them to another department such as the front desk.

Navea testified that he went to Perzigian when the petty cash needed to be replenished.  Between 2011 and 2014, Perzigian "usually" asked him to change the amounts of the petty cash checks because she had "some manager's expense and entertainment.  Her excuse was . . . that some restaurants don't accept credit cards."  Navea would change the amounts of the petty cash checks by voiding the checks.  Perzigian did not give him receipts for the extra money.  At some point, Navea noticed that the manger's expenses were increasing, but he did not ask Perzigian about it because his job as an accountant was simply to record the transactions.  He did not talk to Vidovich about it because Vidovich was not his boss and Navea was concerned about keeping his job.

Navea testified that Perzigian signed all of the petty cash checks and that he never signed the checks in Perzigian's name.  Navea cashed the petty cash checks as part of his job as controller and returned the cash to the hotels to replenish the petty cash drawers.  He did not keep the cash.  Around October 2011, Perzigian started telling Navea to divide the amount the petty cash checks were written for and to write two petty cash checks for her signature because she did not want the petty cash checks to be over $2,000.

Navea became aware of the internal investigation into the petty cash accounts on Friday, October 28, 2014, when he met with a De Anza auditor.  Perzigian told Navea that she did not want to attend the meeting; she stayed in her office instead.  When the auditor mentioned that "the checks seemed to be spiking over time in both amount and number," Navea told him that it was Perzigian's decision and that his job was to write the checks "per Perzigian's order" and then give them to her for her signature.

After the meeting, Navea told Perzigian that the auditor had questions about the petty cash.  When Navea relayed his answers to Perzigian, Perzigian became upset with

6

him, saying that he should not have told the auditor that she was in charge of the petty cash. "Then she said, 'Either resign or I fire you.' " Perzigian called Navea on the Sunday after the meeting and told him that he had to " 'go now' " because the accountants were coming on Monday. Perzigian told Navea to " '[g]o to the Philippines.' " Perzigian also said that the police were looking for him. Navea was very nervous and decided to go. He submitted his resignation letter and left that night. Navea eventually returned to the United States to support his family because he "didn't hear anything" and thought that maybe nothing had happened.

**B.** *Charges, Verdicts, and Sentence*

Navea was charged by information with seven counts of grand theft by an employee (§ 487, subd. (b)(3); counts 1-7). A white collar crime allegation was attached to all counts (§ 186.11, subd. (a)(1)-(2); counts 1-7). The information also alleged that three of the offenses involved a loss in excess of $65,000 (§ 12022.6, subd. (a)(1); counts 2, 3, and 6) and two of the offenses involved a loss in excess of $200,000 (§ 12022.6, subd. (a)(2); counts 4-5).

A jury found Navea guilty as charged.

The trial court sentenced Navea to an aggregate term of nine years four months in prison. The court imposed the upper term of three years on count 5 plus two years for the section 12022.6, subdivision (a)(2) enhancement; a consecutive eight-month term on count 4, which was one-third of the midterm, plus eight months for the section 12022.6, subdivision (a)(2) enhancement, which was also one-third of the midterm; and a consecutive three-year term for the section 186.11, subdivision (a)(1)-(2) enhancement. The court imposed a concurrent midterm sentence of two years on each of the remaining counts and enhanced Navea's sentence on counts 2, 3, and 6 with a one-year concurrent term pursuant to section 12022.6, subdivision (a)(1).

7

### III. DISCUSSION

When Navea committed his offenses, section 12022.6 provided several levels of sentence enhancements for crimes that involved the taking, damaging, or destruction of property that resulted in losses in excess of $65,000. (Former § 12022.6, subd. (a)(1)-(4).) As relevant here, the statute provided an additional one-year term for losses exceeding $65,000 and an additional two-year term for losses exceeding $200,000. (Former § 12022.6, subd. (a)(1), (2).)[3] The statute also contained a sunset clause, which stated: "It is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the additional terms imposed. For that reason this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is enacted before January 1, 2018, deletes or extends that date." (Former § 12022.6, subd. (f).) Because the Legislature did not enact a new section 12022.6 before January 1, 2018, the statute was repealed on that date.

Navea contends that the trial court erred when it enhanced his sentence pursuant to section 12022.6 because the statute had been repealed by the time he was convicted on November 1, 2018, and sentenced on May 23, 2019. Navea argues that he was entitled to the retroactive benefit of the statute's repeal because section 12022.6 did not contain a saving clause or a clear expression of legislative intent that the statute's repeal operate solely prospectively.

We are not persuaded. Like other courts before us, we conclude that section 12022.6's repeal by operation of its sunset clause does not apply retroactively to nonfinal judgments, such as Navea's. (See *People v. Medeiros* (2020) 46 Cal.App.5th 1142,

---

[3] The statute provided an additional three-year term for offenses involving the taking, damaging, or destruction of property that resulted in losses exceeding $1,300,000 and an additional four-year term for losses exceeding $3,200,000. (Former § 12022.6, subd. (a)(3), (4).)

1154-1158 (*Medeiros*); *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 336-338 (*Abrahamian*).)

**A. *Trial Court Proceedings***

Before sentencing, the prosecution filed written briefing regarding section 12022.6's repeal. The prosecution contended that the statute's legislative history made clear "there was no ameliorative intent in the sunsetting of Section 12022.6" and, therefore, "the punishments in [s]ection 12022.6 still apply to conduct prior to January 1, 2018." Navea filed written opposition, asserting that the statute's legislative history was unclear and that absent clear legislative intent and a saving clause, the statute's repeal applies retroactively to him.

Relying primarily on *Pedro T.*, the trial court ruled that Navea's sentence could be enhanced under section 12022.6 despite the statute's repeal before Navea's conviction. The court found that the statute's language and legislative history clearly showed the Legislature's intent to apply the statute's penalty provisions to crimes committed before the statute's sunset.

**B. *Standard of Review***

We review questions of statutory interpretation de novo. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072.) When interpreting a statute, "[w]e seek to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] '[W]e begin by looking to the statutory language. [Citation.] We must give "the language its usual, ordinary import and accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' " (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 849-850.) " ' "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." ' [Citation.]" (*Ibid.*) Further, "in assessing the import of a statute, we must

9

concern ourselves with the Legislature's purpose at the time of the enactment." (*Pedro T.*, *supra*, 8 Cal.4th at p. 1048.)

C. *Analysis*

In *Pedro T.*, the California Supreme Court considered "whether one who committed [an offense] during the effective period" of a temporary increased penalty provision "but whose conviction for that offense was not yet final as of the 'sunset' date of that provision, can be sentenced thereunder. We answer this question in the affirmative…." (*Pedro T.*, *supra*, 8 Cal.4th at p. 1043.) The court observed that "[o]rdinarily when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest. In the case of a 'sunset' provision attached to a temporary enhancement of penalty, the same inference cannot so readily be drawn." (*Id.* at p. 1045.) Thus, the court determined that the retroactivity rule announced in *In re Estrada* (1965) 63 Cal.2d 740, 748—that generally "where [an] amendatory statute mitigates punishment and there is no saving clause, . . . the amendment will operate retroactively so that the lighter punishment is imposed" to convictions not yet final as of the amendment's effective date—did not apply to sunset provisions. (*Id.* at p. 1043.) "[T]he very nature of a sunset clause, as an experiment in enhanced penalties, establishes—*in the absence of evidence of a contrary legislative purpose*—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period." (*Id.* at p. 1049, italics added.)

As stated, former section 12022.6 contained a sunset provision mandating the statute's repeal on January 1, 2018, unless the Legislature enacted a new section 12022.6 before that date. (Former § 12022.6, subd. (f).) The statute did not contain a saving clause.

While Navea claims that he is entitled to the retroactive benefit of section 12022.6's repeal, he points to no evidence demonstrating that the Legislature did not

intend for section 12022.6's enhanced punishment scheme to apply to offenses committed throughout its effective period. Thus, because Navea committed his offenses during section 12022.6's effective period and section 12022.6 was repealed by operation of its sunset clause, Navea has failed to establish that the trial court erred when it enhanced his sentence pursuant to the statute. (See *Pedro T.*, *supra*, 8 Cal.4th at p. 1049; *Abrahamian*, *supra*, 45 Cal.App.5th at p. 337.) Moreover, we determine that the statue's language and legislative history establish that the Legislature intended the statute's sunset clause to operate solely prospectively. (See *Medeiros*, *supra*, 46 Cal.App.5th at p. 1157.)

Section 12022.6's sunset clause stated that "[i]t is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the additional terms imposed. *For that reason*, this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is enacted before January 1, 2018, deletes or extends that date." (Former § 12022.6, subd. (f), italics added.) Through that language, the Legislature expressly declared that the sunset provision was enacted to permit the Legislature's consideration of the effects of inflation on the enhancement terms within 10 years. (See *Medeiros*, *supra*, 46 Cal.App.5th at p. 1151.) The sunset clause evinced "an intent by the Legislature to ensure punishment under section 12022.6 [would] continue to be commensurate with culpability in terms of the 'real' value of the dollar." (*People v. Nasalga* (1996) 12 Cal.4th 784, 796-797 [construing a nearly identical sunset provision in an earlier version of section 12022.6].) "It is clear from this language that the Legislature planned the conditional repeal as a mechanism to review the effects of inflation, not because it determined enhancements should no longer apply for excessive taking in 10 years." (*Medeiros*, *supra*, at p. 1151.)

In addition, section 12022.6's legislative history indicates an intent by the Legislature that the statute's sunset clause apply solely prospectively. The sunset provision at issue was amended in 2007 by Assembly Bill No. 1705 (2007-2008 Reg.

11

Sess.). "The legislation increased the threshold loss amounts for application of the excessive taking enhancements and extended the sunset date by an additional 10 years to January 1, 2018. (Stats. 2007, ch. 420, § 1.)" (*Medeiros*, *supra*, 46 Cal.App.5th at p. 1152.) Assembly Bill No. 1705 expressly stated, "It is the intent of the Legislature that the amendments to Section 12022.6 of the Penal Code by this act *apply prospectively only* and shall not be interpreted to benefit any defendant who committed any crime or received any sentence before the effective date of this act." (Stats. 2007, ch. 420, § 2, italics added.) The Legislative Counsel's Digest declares: "This bill would state the Legislature's intent that the provisions of the bill be reviewed within 10 years to consider the effects of inflation on its provisions and that it be applied prospectively only." (Legis. Counsel's Digest, Assem. Bill No. 1705 (2007-2008 Reg. Sess.); see also *Medeiros*, *supra*, 46 Cal.App.5th at pp. 1152-1154 [detailing former section 12022.6's legislative history].)[4]

Navea asserts that the legislative intent behind section 12022.6's sunset provision is not sufficiently clear to deviate from "the general rule of interpreting penal statues in favor of the defendant." (Bold omitted.) However, "[t]he general rule applies only when some doubt exists as to the legislative purpose in enacting the law." (*Pedro T.*, *supra*, 8 Cal.4th at p. 1046.) Given the sunset clause's express language stating that it was enacted to ensure the Legislature's consideration of the effects of inflation within 10 years (former § 12022.6, subd. (f)) and Assembly Bill No. 1705's express statement that the amendments to section 12022.6, which included the sunset clause, apply solely

---

[4] Section 12022.6's repeal appears to have been inadvert. "In 2018, the Legislature passed new [urgency] legislation reinstating section 12022.6, allowing a court to impose one-, three-, and four-year enhancements with increased penalty threshold amounts and no sunset provision. The legislation was vetoed by the Governor, but that Assembly floor analysis expressly states section 12022.6 was 'inadvertently' repealed on January 1, 2018. (Assem. Floor Analysis, Conc. in Sen. Amendments of Assem. Bill No. 1511 (2017-2018 Reg. Sess.) as amended May 22, 2018, Aug. 24, 2018, p. 1.)" (*Medeiros*, *supra*, 46 Cal.App.5th at p. 1155.)

prospectively (Stats. 2007, ch. 420, § 2), we conclude Navea is not entitled to the application of the general rule as there is not "some doubt" regarding the Legislature's intent in enacting the sunset provision. (*Pedro T.*, *supra*, at p. 1046.)

Navea attempts to distinguish *Pedro T.* by observing that the statute at issue there involved "a three-year test of stricter punishments" in response to a " 'rapid increase in motor vehicle theft.' " (*Pedro T.*, *supra*, 8 Cal.4th at p. 1046.) Indeed, in concluding that the defendant was not entitled to the retroactive benefit of the statute's repeal, which occurred by operation of its sunset clause, the California Supreme Court reasoned that the experiment's utility "might be seriously undermined if [the increased] penalties, instead of applying to all offenders during the three years, could be imposed only on those whose convictions became final before the sunset date." (*Ibid.*) The court also surmised that "[t]he validity . . . of any conclusions . . . could be weakened by the underinclusiveness of a sampling of offenders comprised only of those whose convictions happened to become final before the sunset date of the increased penalties." (*Ibid.*) In contrast, section 12022.6's penalty enhancement scheme was initially enacted in the 1970s. (Stats. 1976, ch. 1139, § 305.5.) Because section 12022.6 was not a temporary experiment, Navea argues that *Pedro T.*'s reasoning does not apply here.

However, *Pedro T.*'s determination that the sunset clause at issue did not apply retroactively to nonfinal judgments rested not on the temporary nature of the statute's enhanced penalties, but on the Legislature's express declaration that the penalties were necessary to increase deterrence. (*Pedro T.*, *supra*, 8 Cal.4th at p. 1046.) Thus, the court could not "reasonably infer" from the Legislature's enactment of the sunset clause that "the Legislature ha[d] determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest." (*Id.* at p. 1045.) The court stated that its findings regarding the negative "practical effect" of interpreting the sunset provision to apply retroactively simply "reinforced" its conclusion. (*Id.* at p. 1046.) Further, the court concurred with the Court of Appeal's observation that "a rule that

13

retroactively lessened the sentence imposed on an offender pursuant to a sunset clause would provide a motive for delay and manipulation in criminal proceedings" (*id.* at pp. 1046-1047)—reasoning that applies with full force to section 12022.6's sunset provision and weighs against finding that the Legislature intended section 12022.6's sunset clause to operate retroactively (see *Medeiros*, *supra*, 46 Cal.App.5th at p. 1156). "When the Legislature signals, years in advance, its intention to reduce the punishment for an offense, defendant and counsel have a strong incentive to delay the finality of a judgment in the hope of eventually receiving the lessened, post-sunset term. The Legislature could not have intended to encourage such machinations." (*Pedro T.*, *supra*, at p. 1047.)

Thus, because there is no evidence that the Legislature intended section 12022.6's repeal to apply retroactively to nonfinal judgments, we conclude that the trial court did not err when it enhanced Navea's sentence pursuant to section 12022.6 despite the statute's repeal by operation of its sunset clause before his conviction. (See *Pedro T.*, *supra*, 8 Cal.4th at p. 1049.)

## IV.    DISPOSITION

The judgment is affirmed.

_____

Greenwood, P.J.

WE CONCUR:


_____

Elia, J.


_____

Grover, J.


People v. Navea
No. H047253